MATTHEWS *v.* BAILEY, GOVERNOR.

4-5648                                    130 S. W. 2d 1006

Opinion delivered July 10, 1939.

*Beloit Taylor* and *E. Chas. Eichenbaum,* for appellant.

*Jack Holt,* Attorney General, *Walter L. Pope* and *Thompson, Wood & Hoffman,* for appellees.

*Caudle & White, Shields M. Goodwin, Rose, Loughborough, Dobyns & House, Coleman & Riddick* and *Burke, Moore & Walker, amici curiae.*

GRIFFIN SMITH, C. J. Appellant Matthews, alleging ownership of certain highway refunding bonds issued by the state under authority of Act 11, approved February 12, 1934, seeks to restrain the Governor and members of the State Board of Finance from carrying into effect an Executive Order issued June 25, 1939, by the terms of which it is proposed to issue state highway refunding bonds aggregating in face value $140,537,253.20.

It is alleged, and the record discloses, that the Order in question was approved by the Board.[1]

Other allegations are:

(1) That the Governor, in promulgating his Order, assumed to proceed under powers conferred by Act 130, approved February 24, 1937, as amended and supplemented by Act 151, approved February 24, 1937, and Act 278, approved March 19, 1937.[2]

---

[1] The resolution adopted by the Board of Finance follows:

"Be it resolved by the Board of Finance of the state of Arkansas that the conclusions of the Governor as recited in his executive order made in accordance with act 130 of the General Assembly of the state of Arkansas of 1937, dated the 25th day of June, 1939, be and the same are hereby concurred in and that the Board of Finance approve and it does so approve the action of the Governor in the issuing of such executive order."

[2] Act 278 of 1937 is entitled: "An Act to provide for the carrying out of the provisions of Acts No. 130 and 151 of the Fifty-First General Assembly, . . . to make appropriations therefor, and for other purposes." It appropriated $150,000,000 to "effectively, effi-

(2). That the three mentioned Acts contemplate separate issues of bonds for the purpose of refunding each of the several groups of bonds delivered under authority of Act 11 of 1934.[3]

(3) That Act 130 expressly provides that the refunding bonds of each issue shall bear interest at a rate lower than that borne by the new bonds so authorized, except that as to outstanding bonds bearing interest at three per cent., and those bearing interest at three and one-half per cent., the existing rates may apply.

(4) That Act 130, as amended, does not permit more revenue to be pledged than was pledged by Act 11.

It was further averred that the Executive Order does not authorize separate bond issues to refund the several existing issues, but on the contrary it contemplates a single issue of $140,537,253.20 to be used in refunding all of the outstanding bonds and other obligations issued under authority of Act 11.

(5) That the Order assumes unauthorized powers in directing inclusion of refunding certificates of indebtedness and funding notes, whereas Act 130 permits issuance of bonds only to refund bonds (as distinguished from certificates of indebtedness and funding notes) authorized by Act 11.

(6) That the attempt, as expressed in the Order, to make the new bonds a first charge upon the highway fund, is violative of express limitations found in Act 130.

(7) That the Order undertakes to authorize issuance of three per cent. refunding bonds to retire interest-free bonds issued under authority of Act 11.

---

ciently and speedily refund or refinance the obligations provided for in Act 11 [of 1934]." There were no material enlargements of the powers conferred on the Executive by Act 278. The appropriation of $150,000,000 expired by constitutional limitation two years from its enactment. (Art. 5, Sec. 29, Constitution of 1874.) Act 151 created the Board of Finance. By Act 257 of 1939 a presently available appropriation of $142,000,000 was made.

[3] References to "Act 11" are to the measure approved February 12, 1934, and the year of enactment will not be repeated. Likewise, references to "Act 130" are to the legislation approved February 24, 1937.

(8) That pledges made in the Order will result in a diminution of moneys available to the county highway fund.

(9) That the Order directs issuance of $140,537,-253.20 of refunding bonds dated October 1, 1939, drawing interest from such date, notwithstanding the fact that existing bonds aggregating $47,534,668.72 do not mature, nor are they callable, prior to January 1, 1940.

(10) That during the intervening months (October, November, and December, 1939) there will be a duplication of indebtedness, in violation of the Constitution of Arkansas.

(11) That duplicate interest will be incurred on such item of $47,534,668.72.

(12) That Act 130 is void because it was not passed in compliance with §§ 21 and 22 of Art. 5 of the State Constitution.

It is a matter of common knowledge, of which we take judicial notice, that when the highway debt of $159,-900,503.84 was refunded, the state's financial status was at an all-time low. From the standpoint of economics, the country was in the trough of a far-reaching depression, and Arkansas was faced with the alternative of continuing in its defaults or making common purpose with its creditors in a manner satisfactory within the circumstances and acceptable to those whose money it had borrowed and had used. It chose the latter and the courageous course; and it thereby made commitments under legislative and executive sanctions which in principle have been honorably kept. The result, as it is said in one of the excellent briefs filed in this case, has been that highway bonds have attained a much higher rating in the nation's money markets.

Commenting upon conditions existing at the time Act No. 11 was passed, Special Justice Wooten, who wrote the opinion in *Scougale* v. *Page*,[4] quoted with approval the following: "The two committees [negotiating the refunding measure] realized that it would be

---

[4] 194 Ark. 280, 106 S. W. 2d 1023.

useless to adopt a program which the states would be financially unable to carry out. In view of the depleted revenues and enormous debts of the state, the bondholders' committee made concessions which were more than generous.'"[5]

It is now asserted that the period of financial stress has passed; that highway revenues have consistently increased; that obligations of $19,363,250.64 have been paid through redemption accounts established in 1934; that confidence in the state's resources and in its pledges has been fully restored, and that men of money stand ready to take bonds at lower rates of interest, redeemable in not more than forty years,[6] and to supply funds with which the existing indebtedness may be discharged.

The Governor, wisely anticipating a day when this eventuality might ripen, suggested to the Fifty-First General Assembly that provision should be made for possible refunding, with the result that Act No. 130 emerged.

We are to determine, therefore, (1) whether the Act is in conflict with the Constitution, and (2) if it is not, then whether powers the Governor proposes to exercise exceed those conferred upon him and upon the Board of Finance.

[5] The opinion in the Scougale-Page Case approvingly quoted the following from one of the briefs: "In 1933, the state defaulted in the payment of the current interest due on the highway bonds. The state was so financially distressed that it not only could not pay the interest on its highway obligations, but it was unable to meet some of the ordinary expenses of government. It was without funds to meet the expense of the legislative session; the penitentiary had accumulated an enormous debt; contractors' claims for construction of highways exceeded a million dollars; the charitable institutions were suffering for lack of funds and the treasurer was unable to cash the warrants for the salaries of state officers. The highway bonds were selling on the open market at 30 cents on the dollar. The state of Pennsylvania had filed a suit in the Supreme Court of the United States against the state of Arkansas to collect highway bonds owned by it."

[6] It was stated in oral argument on behalf of appellees that maximum maturity dates would probably be thirty-five years, rather than forty years as set out in the Executive Order.

Summarizing Act 130 as to powers conferred upon the Governor, it is found:

(1) That discretion reposes in the Governor to determine whether it is for the best interest of the state to sell or exchange bonds.

(2) If that discretion is exercised, the Governor shall file with the Secretary of State an executive order setting the refunding machinery in motion. He shall declare, in effect, that it would be in the interest of the state that general refunding bonds be issued and sold or exchanged, subject to conditions contained in § 1 of the Act; but (Act 151) "No power or authority given the Governor by the provisions [of Act 130] may be exercised except with the approval [of the Board of Finance] at a meeting called by the Governor."

(3) The Governor may enter into a contract or contracts on the part of the state with an agency or agencies to assist him in marketing or exchanging bonds as contemplated by the Act, ". . . and to fix and determine the conditions and provisions of such contract or contracts, within such limitations as to expenditures and compensation as may be determined by legislative appropriation."

(4) Maturity dates of bonds, not exceeding forty years, may be fixed by the Governor, and denominations of the bonds, the place or places of payment, and like matters, may be determined by the Executive.

(5) At the time of directing issuance of bonds, the Governor, in his Executive Order, may pledge to the payment of the principal thereof, all, or such portion as may be necessary, of the revenues pledged under Act 11 ". . . to the payment of the principal of those certain bonds which are then to be refunded."

(6) If the Governor determines to refund, such intent shall be certified to the Refunding Board, and a request shall be made that the Board proceed under authority of § 16 of Act 11 to call for redemptions on the next interest payment date.

(7) Reductions of percentages of the state highway fund set aside under § 2 of Act 11 pledged for the payment of bonds may be made by the Governor from time to time in proportion as the bonds secured thereby are exchanged or redeemed.

(8) Before bonds may be sold or exchanged, the Governor must first direct the Treasurer of State to advertise for sealed bids. . . . "All bids shall be opened by the State Treasurer in public and in the presence of the Governor, and the Governor shall have the right to reject any and all bids; provided, however, that nothing in this section contained shall be construed to prevent the exchange of general refunding bonds for a like principal amount of outstanding bonds bearing a higher rate of interest, without previous advertisement as herein required in the case of the sale of such general refunding bonds."

(9) The Governor may, at his option, authorize issuance of bonds containing a clause reserving to the state the right to call for redemption prior to maturity, on thirty days' notice.

Assuming that Act 130 conferred upon him all of the powers necessary to do those things set out in the Executive Order, one provision of the Order is:

"Said bonds shall be dated October 1, 1939, and shall bear such rates of interest and shall mature at such time or times not exceeding forty years, as shall be hereafter fixed by executive order approved by the Board of Finance; provided, however, that the interest rates borne by the refunding bonds shall be so fixed that for the aggregate amount of outstanding obligations bearing any one rate of interest there shall be at least an equal amount of refunding bonds bearing a lower rate of interest, except that there may be an amount of refunding bonds equal to the amount of outstanding obligations, which bear interest at the rate of 3½ per centum per annum, which may bear interest at a rate not exceeding such rate, and an amount of refunding bonds equal to the amount of outstandng obligations, which bear interest at

the rate of 3 per centum per annum, or no rate of interest, which may bear interest at a rate not exceeding 3 per centum per annum."

If authority for the procedure affirmed in the Order has been expressly conferred by Act 130; or if, by fair construction, it can be said that the things the Governor contemplates doing were intended by the Legislature, and if that intent can be gathered from the language used, then the lower court's action in denying injunctive relief should be sustained.

While questions of public policy are for the General Assembly, and matters of administration are of executive address, it is the court's duty to construe the law. Through praiseworthy initiative of the two co-ordinate branches of government, the third branch now called upon to determine legality of the questions presented. In approaching the subject we assume that negotiations attending the Executive Order were characterized by the utmost good faith and sincerity of purpose.

It must be conceded that Act 130, in its relation to Act 11, is subservient to the latter if the two measures conflict in any material sense affecting the rights of bondholders, or touching privileges retained by the state.

It would be difficult to express the legislative intent in clearer language than that used in § 6 of Act 130, where it is said: "The General Assembly hereby recognizes and confirms all of the obligations and duties created and established by and under Act 11, . . . and hereby declares that this Act is not in any manner to impair or to violate the terms of said Act 11. The percentage of the state highway fund set aside and pledged for the payment of bonds under § 2 of the aforesaid Act 11 shall be and remain as therein set forth, subject only to reduction from time to time in proportion as the bonds secured thereby are exchanged or redeemed out of the proceeds of the general refunding bonds herein authorized to be issued, and the Treasurer of State is hereby authorized to make such reduction upon certification of the Governor fixing the amount thereof."

When the quotation from § 6 is read in connection with parts of § 1 of the same Act, it is certain the General Assembly had in mind, and that those who wrote Act 130 intended, to provide machinery for refunding, in whole or in part, (and through sale of bonds and purchase at interest-paying periods, or by the exchange of bonds of a new issue bearing a lower rate of interest than the old securities)[7] such portions of the bonds issued under authority of Act 11 as might by agreement with holders be negotiated. This intent is reflected by the expression in § 1 that "Such general refunding bonds may be issued in such amount or amounts and at such time or times, and from time to time, and in such manner, as the then Governor . . . may determine." By § 2 this plan is further shown by the expression: "The Governor may exercise the aforesaid authority at any time or from time to time, whenever he shall find and determine . . . that such general refunding bonds can be issued and sold or exchanged subject to the conditions contained in § 1 hereof."

It is contended by appellant that authority delegated by Act 130 permits the Governor, with approval of the Board, only to issue refunding bonds corresponding with the several issues outstanding; and, conversely, that power is lacking to market a single issue of sufficient magnitude to retire all of the outstanding obligations as a single transaction. Specifically, the complaint says it is *expressly* provided that ". . . the refunding bonds of *each such issue* shall bear interest at a rate lower than that borne by the issue of bonds to refund which such refunding bonds shall be issued."

Appellants are in error in stating that the Act, by *express* language, requires refunding bonds "of each such issue" to bear a rate of interest lower than that borne by the issue to be refunded. No such language

---

[7] An exception as to interest is that old bonds bearing 3 per cent. or those bearing 3½ per cent., might be exchanged for new 3 per cent., or 3½ per cent. bonds, or that new 3 per cent. and 3½ per cent bonds of an equal amount might be sold, and the proceeds used in retiring the old bonds.

was used in the Act. On the contrary, the authority is that such bonds may be issued ". . . in an amount or amounts not exceeding, in the *aggregate,"* . . . etc.

The only restriction in § 1 (other than with respect to 3 per cent., and 3½ per cent. bonds) is the phrase: ". . . provided such general refunding bonds are issued and sold at not less than par and accrued interest and bear a lower rate of interest than the bonds to be redeemed out of the proceeds of such sale."

We think when the quotation from § 6 is read in connection with parts of § 1 of the same Act, it is certain the General Assembly had in mind to authorize the refunding of such portions of the existing indebtedness as the executive might direct; or, in the alternative, to exchange new bonds for old bonds. In either event the transaction is to be consummated at an interest-paying period, and may include all or a part of any *issue* of existing bonds as identified by the original sale, whether such original sale was of bonds or notes or certificates of indebtedness first issued in one form and converted into a different form, or whether an indebtedness recognized under Act 11 was funded with obligations designated as bonds, notes or certificates of indebtedness; provided, that in respect of any issue of obligations, or of any series of securities sold or exchanged to retire an old obligation as classified by Act 11, the rate of interest to be paid on the new bonds must be lower than that borne by the old obligation, an exception being that old securities bearing 3 per cent. interest, or those bearing 3½ per cent. interest, may be exchanged for new bonds bearing rates of interest corresponding with the old rates; or new bonds bearing rates of interest corresponding with the old rates may be sold to retire, in whole or in part, the existing 3 per cent. or 3½ per cent. bonds, certificates, or notes.

For example, $77,397,000 of Series "A" bonds are dated January 1, 1934, maturing in stated amounts from 1945, to 1977. Of this series an issue of $12,946,000

draws interest at 4¼ per cent.[8] Another issue aggregating $12,572,000 draws interest at 4½ per cent., with maturities beginning in 1948, final maturities being 1958. A third group bears interest at 4¾ per cent. Maturities begin in 1945, omit 1954 to 1958, include 1959 to 1967; omit 1968, include 1969 to 1975, at which latter date final payments are made. The fourth group amounts to $34,-624,000, on which interest is 5 per cent., with maturities from 1945 to 1977.

Four separate interest rates are shown in the series. We think the General Assembly, in dealing with the subject-matter of Act 130, had in mind that these issues could be grouped—that is, if the bonds were to be *exchanged,* then all bearing 4¼ per cent. interest might be so exchanged at any rate lower than 4¼, and so on in respect of each of the four issues; but, if new bonds were sold

[8] Refunding bonds originally issued, the par value of bonds retired, and the outstanding bonds as of July 1, 1939, are shown in the table below:

| Classification | Par Value Issued | Par Value Retired | Par Value Outstanding 7-1-39 |
|---|---|---|---|
| Highway Refunding, Series "A" | $ 84,000,000.00 | $ 6,603,000.00 | $ 77,397,000.00 |
| Highway Refunding, Series "B" | 9,156,050.00 | 151,424.72 | 9,004,625.28 |
| Toll Bridge Refunding, Series "A" | 7,220,000.00 | 1,489,000.00 | 5,731,000.00 |
| Toll Bridge Refunding, Series "B" | 918,173.00 | 48,213.80 | 869,959.20 |
| DeValls Bluff Bridge Refunding | 421,068.60 | 41,642.60 | 379,426.00 |
| Road District Refunding, Series "A" | 47,010,075.00 | 8,187,550.00 | 38,822,525.00 |
| Road District Refunding, Series "B" | 4,388,927.76 | 2,135,914.12 | 2,253,013.64 |
| Refunding Certificate of Indebtedness (Street Aid) | 6,175,222.30 | 420,147.67 | 5,755,074.63 |
| (Contractors') Funding Notes | 610,987.18 | 286,357.73 | 324,629.45 |
| Totals | $159,900,503.84 | $ 19,363,250.64 | $140,537,253.20 |

Of the above outstanding obligations the State of Arkansas owns $654,050.96 par value, including $54,319.99 Road District Refunding, Series "B".

in an amount sufficient in the aggregate to retire the entire series in a manner showing an *average* saving in interest, this might be done.

Outstanding toll bridge refunding bonds, Series "A," amount to $5,731,000. Of this series $1,984,000 bear 4¾ per cent. interest, and $3,747,000 bear interest at 5 per cent. Maturities on the 4¾'s are from 1943 to 1965; on the 5's, final maturities are in 1964.

Other series are: Road district refunding bonds, Series "A," payable in 1949, and bearing interest at 3 per cent.—$38,822,525.

State highway refunding bonds, Series "B," payable in 1953, and bearing interest at 3½ per cent.—$9,004,625.28.

State toll bridge refunding bonds, Series "B," payable in 1953, and bearing interest at 3½ per cent.—$869,959.20.

Road district refunding bonds, Series "B," payable in 1949 without interest—$2,253,013.64.

DeValls Bluff bridge refunding bonds, payable in 1950, and bearing interest at 3 per cent.—$379,426.

Funding notes, payable in 1954, and bearing interest at 3 per cent.—$324,629.45.

Refunding certificates of indebtedness, payable in 1944, and bearing interest at 3 per cent.—$5,755,074.63.

Four of the preceding items—$38,822,525, $379,426, $324,629.45, and $5,755,074.63—draw interest at 3 per cent. They aggregate $45,281,655.08. Two items—$9,-004,625.28 and $869,959.20 bear 3½ per cent. interest. They total $9,874,584.48.

The remaining item of $2,253,013.64 does not carry any interest, and is a principal subject of controversy.

It is difficult in many cases to ascribe to the law-making body a specific intent unless that intent is expressly affirmed. Complexity of the subject-matter with which the Fifty-First General Assembly was dealing, the known variants in interest rates, and the phraseology of Act 130, all lead to the conclusion that the separate

series, as distinguished from the several issues, were visualized. This construction is strengthened by the fact that bonds bearing 3 per cent. interest, and those bearing interest at 3½ per cent., were singled out, the four 3 per cent. items seemingly having been treated as one group, and the two 3½ per cent. items having been treated as another group. It was apparently contemplated that these low-interest bonds could not be refunded at lower rates.

It may be argued, and with force, that identification of two classifications (3's and 3½'s) had the effect of placing in another group *all* remaining bonds, notes, and certificates, and that, irrespective of varying interest rates, $55,156,239.56 of three percent bonds, and three and one-half percent bonds, were segregated from $140,537,253.20 merely for the purpose of permitting bonds bearing higher rates of interest aggregating $83,128,000 to be refunded at any interest lower than the average total; or, in the alternative, allowing refunding of any part of this total. When the sum of $2,253,013.64 representing interest-free bonds is added to the item of $83,128,000 the result is $85,381,013.64, and this, with the $55,156,239.56, gives the grand total of $140,537,253.20.

We do not believe it was the purpose of the Legislature to allow $2,253,013.64 of non-interest bonds to be included in any arrangement whereby interest would be generally lowered by virtue of this concession. These interest-free securities are known as road improvement district ''B'' bonds, and were issued in 1934 in evidence of past-due interest. Under Act 11 they are tied in with road improvement district ''A'' bonds, for the payment of which, after 1936, 33.6 per cent. of net highway funds was pledged. The bonds have ten years yet to run. If they should be refunded at 3 per cent. such increased interest would be $774,848.29. This, over a ten-year period, when added to the principal, would be $3,027,861.93.

If it had been the intention of the Legislature to permit these bonds to be included in a group and refunded on an interest basis, that intent should have been expressed in language sufficiently clear for reasonable

men to understand it. We do not think the plan contemplated a departure so completely shrouded in general terms from which the result contended for by appellees may only be guessed.

It is conceded that it is *possible* to draw from the language utilized the urged construction; but, believing as we do that the General Assembly not only did not intend such, but that the idea was not even entertained as a possibility, it must be held that authority for the refunding in that respect is lacking.

Nor do we think there is sanction for paying interest from October 1, 1939, to January 1, 1940, on $47,534,668.72 of bonds issued to retire an equal amount of bonds not callable until January. The result would be that the old bonds would draw the interest now specified, and also, covering the same period, $475,346.68 of additional interest would be paid, if the new rate should be four per cent. Section 5 of Act 130 seems to be conclusive of this proposition. There it is declared that "When the Governor shall determine to exercise the authority hereunder conferred upon him to sell general refunding bonds, he shall certify to the State Refunding Board . . . a request that said Board proceed under the authority of § 16 of Act 11 to call for redemption, on the next interest payment date, the principal amount of outstanding bonds specified by the Governor, and it shall thereupon be the duty of said State Refunding Board to issue a call for the redemption of said bonds and give notice thereof as provided in § 16 of said Act 11."

The only authority delegated to the Governor to call bonds for cancellation is that contained in § 5 of Act 130. The General Assembly had a right to say how the calling-in process should function, and it exercised that right in 1934. It did not say that in an emergency occasioned by condition of the money market, or due to requests of brokers whose offer to refund was conditioned upon immediate action, a discretion materially at variance with § 5 might be exercised; and since that discretion, if assumed and invoked, would involve a duplica-

tion of substantial interest payments, (though such sum should be absorbed through lower interest rates to be paid on the refunding bonds) we cannot say that the General Assembly would, if informed of the circumstances, have legislated differently. In brief, a judicial determination that a broader discretion ought to have been conferred, even if we should feel that the situation warranted such, cannot be substituted for a non-existent authority, or one to be implied alone from seeming necessity and financial impatience.

The next question is, Does Act 130, or do any of the other Acts, permit issuance of non-callable bonds? Our answer is that we find no such authority .

Section 16 of Act 11 has been referred to, *supra*. It affirmatively declares that the state shall not issue highway obligations unless a provision was inserted reserving the right of redemption before maturity, at par and accrued interest, at any interest paying date.

Act 130, § 8, enlarges this right by providing that any new bonds shall contain a clause reserving to the state the right, at its option, to call in, pay, and redeem prior to respective maturity dates, and that this right may be exercised, not at an interest-paying period only, but after notice of intention had been published for one insertion (not less than thirty days) as directed. There is the further provision that "Bonds issued hereunder to refund bonds bearing interest at the rate of three or three and one-half per centum per annum may provide for call at a premium."

Under Act 11 bonds may be called only at interest paying periods. Under Act 130 they may be called at any time, after the 30-day notice has been given. If the provision in Act 130 had been inserted in Act 11, then the power the Governor seeks to exercise in calling, as of October 1, 1939, bonds upon which interest is not payable until January 1, 1940, could be invoked, and the overlapping interest would not be payable; provided, of course, that when the bonds were issued the option spoken of in § 8 had been exercised.

Some meaning must be ascribed to § 8 of Act 130—a section obviously expressed negatively if the purpose is to confer the power insisted upon by appellees.

It will be noted that the Act does not, in respect of bonds other than 3's and 3½'s, authorize issuance of non-callable securities. (§ 8 is printed in the margin.[9]) If the intent had been to delegate authority to issue $83,128,000 of non-callable bonds, in addition to those callable upon payment of a premium, that purpose would have been expressed affirmatively. We conclude, therefore, that the only modification of § 16 of Act 11 is authorization that bonds may be called at any time on thirty days' notice. It follows that non-callable bonds may not be issued except as expressed in Act 130 unless the Legislature shall so provide, which at its discretion it may.

In all matters of conflict, Act 130 must yield to Act 11. This is true because § 44 of Act 11 declares: "This Act shall constitute a contract between the state and such creditors, including the affected improvement districts, and the terms of such contract or contracts shall never be impaired by any subsequent legislation." Act 130 affirms the pledge.

Act 11 provides: "The first charge upon the state highway fund shall be the cost of maintaining the state highway system and the operation and maintenance of the toll bridges, and the Treasurer of State shall trans-

---

[9] "Section 8. In the event that the Governor should determine to issue bonds hereunder containing a clause reserving to the State the right, at its option, to call in, pay and redeem such bonds prior to their respective maturity dates, which he is hereby authorized to do, he shall provide in his aforesaid executive order that such general refunding bonds shall provide that notice of the exercise of such option be published for one insertion, not less than thirty days before the date set for the redemption of such bonds, in a newspaper published in the City of Little Rock, Arkansas, in a newspaper published in the City of St. Louis, Missouri, and in a financial journal published in the Borough of Manhattan, City of New York, New York, and such bonds shall show such provisions on the face thereof. Bonds issued hereunder to refund bonds bearing interest at the rate of three or three and one-half per centum per annum may provide for call at a premium."

fer from said state highway fund to the highway maintenance fund 25 per cent. of the total amount credited to said state highway fund during any fiscal year, such credit to be not less than $166,666 monthly.''

It is then enacted that the state highway fund ''. . . shall next be applied to the payment of interest upon the bonds and other obligations to be issued or paid under the provisions of this Act.'' The balance of the highway fund, after deducting maintenance and interest, is credited by the Treasurer of State to the payment or redemption of the principal of state highway obligations. This is the balance pledged by Act 11 for the payment of obligations issued under its authority.

Section 4 of Act 130 provides that the Governor ''. . . may pledge to the payment of the *principal* [of the bonds to be issued] all, or such portions as he may deem necessary, of the revenues heretofore pledged under the aforesaid Act No. 11 to the payment of the principal of those certain bonds which are then to be refunded.'' The only revenue authorized by Act 130 to be pledged is the *balance* remaining after 25 per cent. of all highway revenues has been put aside for maintenance.

The Executive Order, we think, transgresses this limitation when it directs: ''For the further securing of this bond there is hereby pledged the revenues of the state highway fund consisting of the proceeds of motor vehicle license fees and taxes, and the proceeds of the tax of five and three-quarters cents per gallon on gasoline or other motor vehicle fuel.''

Section 5 of the Order contains the following covenant, to be incorporated by reference in the bonds:

''It is further covenanted on behalf of the State of Arkansas that it will in each fiscal year beginning with October 1, 1939, segregate and set aside the first revenues of the state highway fund until all of the debt service requirements of such refunding bonds for such year shall have been paid or provided for. Such debt service requirements shall consist of annual interest due upon all

outstanding refunding bonds in such fiscal year, the amount of principal thereof maturing in such year, and the amount of any reserves required to be set up in such year as may be fixed and determined by executive order approved by the Board of Finance.''

Effect of the Executive Order and of Act 11 is to express two preferences—one comprising 25 per cent. of the highway fund, to be not less than $166,666 monthly. The other is the fund designated in the Executive Order and pledged to be ''. . . segregated and set aside [from] the first revenues of the highway fund [for debt service requirements'']. The law and the Order cannot stand together; and necessarily validity must be given the former.

Holders of bonds issued under authority of Act 11 accepted them with the imposed condition, to which they will be held as a matter of law to have impliedly agreed, that highway maintenance should be a first charge against highway funds, and this status must remain until the state, through its legislative department, waives the benefits it retained.

Act 130, § 3, directs: ''The general refunding bonds issued under the authority of this Act shall bear such date, shall be of such denomination or denominations, shall contain such provisions as to registration of principal, shall bear interest at such rate or rates, payable semi-annually, shall be payable in such place or places, within or without the state, and shall be payable at such time or times not exceeding forty years from date thereof, and shall be in such form, as the Governor shall determine and direct, subject to the limitations and provisions herein contained.''

In derogation of these limitations upon executive authority, the Order under review contains the following covenant:

''Whenever in any fiscal year the revenues of the state highway fund shall exceed $20,000,000, the General Assembly of the State of Arkansas shall have the right to reduce the tax upon gasoline, or other motor vehicle

fuel, below the rate now levied to such rate as it is estimated will produce, for the state highway fund, not less than $20,000,000 per annum. And it is hereby covenanted that if, as a result of such reduction in the tax upon gasoline, or other motor vehicle fuel, the amount produced annually for the state highway fund shall fall below said sum of twenty million dollars, the General Assembly of the State of Arkansas will restore such tax to not exceeding the original rate, so that there will be produced, for the state highway fund, not less than $20,000,000.''

This authority cannot be inferred from Act 130. Section 51 of Act 11 is: ''Whenever the net revenue credited to the state highway fund in any fiscal year shall exceed $10,000,000, and the Refunding Board finds that a reduction of the tax on gasoline during the succeeding year could be made without reducing the net revenue below $10,000,000, the Board may, in its discretion, determine the definite amount of such possible reduction, not to exceed one-half of one cent a gallon. The Board shall thereupon order a reduction in the gasoline tax of one-half of such definite amount, and the revenue derived from the other one-half, which shall be collected, or so much thereof as shall be in excess of $10,000,000, shall be transferred from the state highway fund to the county highway fund, and shall be distributed in the manner now provided by law.''

By Act 11, approved April 1, 1938, the extra quarter of a cent per gallon of the gasoline tax was given to the counties.

We do not construe the Executive Order as an express pledge to maintain the highway fund at $20,000,000, or that the tax on gasoline will not be reduced until the fund reaches such maximum. Rather, it is a statement of what the General Assembly shall have a right to do in respect of rate reductions; yet, inferentially, there is the thought that no reduction will be made until existing rates produce $20,000,000 annually. There is an express covenant that if the rates should once be reduced, and

thereafter the revenue does not attain the maximum of $20,000,000, the reduction will be discontinued and the tax restored to its former figure. Lacking authority to make commitments of the kind in question, the Governor did not intend the expression as a definite guarantee.

Although the Governor has the right, under § 7 of Act 130, to *exchange* refunding bonds ". . . for a like principal amount of outstanding bonds bearing a higher rate of interest, *without previous advertisement*, . . ." he must advertise that bonds will be *sold*, and he has the right to reject any and all bids. However, there is not a word in the Act *requiring* that the lowest bid be accepted. This omission is one the Legislature may, or may not, have intended.

A perplexing question is, Was it the purpose of Act 130 to require the Governor to issue a second Executive Order in which terms in detail would be set out before a binding contract could be made? We think it was so intended.

The form of bond it is proposed to issue, showing general characteristics, is set out in the Executive Order. Dates of maturity and interest rates are not shown. The bond is secured by a pledge of the full faith and credit of the state and ". . . the revenues of the state highway fund, consisting of the proceeds of motor vehicle licenses, fees and taxes, and the proceeds of a tax of five and three quarters cents per gallon on gasoline or other motor vehicle fuel."

While the difference between revenues at present pledged by law to the county turnback and revenues to be realized to the turnback under the Executive Order might be regarded as *de minimis*, it is our view that the Legislature, and it alone, possesses power to make apportionments of the kind in question. Until action has been taken by that body prorating such revenues, no pledge differing from that provided by law can be regarded as inviolate.

Finally, we hold that until the General Assembly shall have acted, there is no power in the Governor and

the Board of Finance (a) to issue non-callable bonds; (b) to give a pledge on highway revenues prior to highway and toll bridge maintenance;[10] (c) to pay interest on $2,253,013.64 of "B" bonds which, under the provisions of Act 11, are interest free; (d) to pay overlapping interest during October, November and December, 1939, on bonds not callable until January 1, 1940; (e) to pledge revenues affecting turnback percentages.

We hold that Acts 130, 151, 278, and 257, mentioned in the pleadings, were lawfully passed, and that no constitutional impediments void the measures.

The cause is reversed with directions to overrule the demurrer.

SMITH and McHANEY, JJ., dissent.

MEHAFFY, J., disqualified and not participating.

---

[10] In addition to 25 per cent. of highway funds for highway maintenance, Act 11 authorizes an expenditure of not more than $100,000 per annum for maintenance of toll bridges.