FULKERSON v. REFUNDING BOARD OF ARKANSAS.

4-6356 and 4-6364 (consolidated)          147 S. W. 2d 980

Opinion delivered February 17, 1941.

—PAGE 958]

*Tom Poe,* for appellant.

*Jack Holt,* Attorney General, and *Leffel Gentry,* Assistant Attorney General, for appellee.

SMITH, J. This is the third attempt by the state to refund its outstanding bonded road indebtedness by the issuance and sale of bonds for that purpose since the rendition of the opinion of this court in the case of *Scougale* v. *Page,* 194 Ark. 280, 106 S. W. 2d 1023, delivered June 14, 1937. The opinion in the case of *Matthews* v.

*Bailey, Governor,* 198 Ark. 703, 130 S. W. 2d 1006, delivered July 10, 1939, recites the facts relating to the first attempt which was made under the supposed authority of acts 130, 151 and 278 of 1937 and of act 257 of 1939. It was held that these acts did not confer the authority which the State 'Board of Finance proposed to exercise, and that board was remitted to the General Assembly for the authority found to be lacking in the existing legislation. It was said, however, in the opinion in that case that "We hold that acts 130, 151, 278 and 257, mentioned in the pleadings, were lawfully passed, and that no constitutional impediments void the measures."

To obtain this additional authority a Special Session of the General Assembly was convened which passed an act duly approved August 5, 1939, which became act No. 4 of that Special Session. That act was construed August 16, 1939, in the case of *Matthews* v. *Bailey, Governor,* 198 Ark. 830, 131 S. W. 2d 425.

It was there held that Amendment No. 20 to the Constitution did not nullify that part of Amendment No. 7 which provides that an emergency shall not be declared on any franchise or special privilege or act of the General Assembly creating any vested right or interest or alienating any property of the state. It was further held that the right to refer—and thereby to suspend operation of—a legislative act extends only to measures to which the emergency clause is not attached; that measures carrying the emergency clause may be referred, but the law is in force until an adverse vote has been registered by the people in the manner provided by law. It was further held that a legislative act which authorized a governmental agency to pledge specific resources of the state creates a vested interest or right, notwithstanding the fact that the pledge is not effective until the agency has moved to effectuate the legislative purpose, and that the provisions of Amendment No. 7, prohibiting the declaration of an emergency with respect to such legislation, are not rendered inoperative because the offer to sell bonds secured by the pledge of such resources has not been accepted.

In the absence of an emergency clause, it is expressly provided by Amendment No. 7 that legislative acts become effective ninety days after the adjournment of the session at which they were enacted, and until the expiration of that period they are inoperative, and confer no powers, even though the referendum is not invoked against them. *Gaster* v. *Dermott-Collins Road Imp. Dist.*, 156 Ark. 507, 248 S. W. 2; *Simpson* v. *Teftler*, 176 Ark. 1093, 5 S. W. 2d 350. If, however, the legislative act contains a valid emergency clause, it is effective from and after its passage, and remains in force and effect until an adverse vote has been registered by the people in the manner provided by law. *Matthews* v. *Bailey, Governor*, 198 Ark. 830, 131 S. W. 2d 425.

The General Assembly now in session has passed another act, which is act No. 4 of this session, to enable the state to refund its bonded road debt. This act recites the facts constituting the emergency authorizing the addition of that clause to the act. The facts recited are known to all citizens of this state who have any interest in its fiscal affairs, and those facts render it imperative that the state have the relief which the act is intended to afford at the earliest practicable moment. But however great the emergency, that clause may not be attached if the act creates a vested right or interest. It is so expressly provided in Amendment No. 7, and was so decided in the second Matthews case, *supra.*

We have here a different act from that construed in the Matthews case, *supra,* and the question now presented is, Does act No. 4 of the 1941 session create a vested right? It is entirely certain that the General Assembly did not so intend, for it is recited in § 18 of act 4 that "This act shall not create any right of any character, and no right of any character shall arise under or pursuant to it, unless and until bonds authorized by this act shall have been issued and actually sold or exchanged by the board." This intent is further manifested by § 21, which provides that "No bonds shall be issued under this act except by and with the consent of the qualified electors of the state voting on the question at a special election called for that purpose." In

other words, until the election has been held, and an affirmative vote cast, there is lacking any power to sell bonds. The General Assembly, therefore, exercised the power which it possessed to say that no vested right of any character should arise until the condition precedent had been performed, that is, that the consent of the people had been given.

It must be conceded that the Refunding Board is proceeding very expeditiously to discharge their duties; but it is thought—and we find—that the facts recited in the emergency clause furnished full justification for this expedition. If this act No. 4 is now the law, and is in effect as a law, the board has the power, and is under the duty, to discharge the functions imposed upon its members, and we perceive no constitutional reason why there should be procrastination in the discharge of the duties imposed.

It is objected that present act No. 4 is invalid for the reason that the General Assembly has delegated to the Refunding Board created by its provisions legislative powers. This, of course, may not be done; but, in our opinion, it has not been done. This is a subject which has frequently engaged the attention of this and other appellate courts, and it is sometimes difficult to determine whether the General Assembly has abdicated its exclusive right to legislate or has delegated that authority to some other agency.

We know of no better rule by which to determine this question of fact, when it arises, than that quoted in the opinion in the case of *Harrington* v. *White,* 131 Ark. 291, 199 S. W. 92, where Chief Justice McCulloch, speaking for this court, quoted with approval from the case of *Cincinnati, etc., Rd. Co.* v. *Clinton County Commissioners,* 1 Ohio State 77, as follows: " 'The true distinction is between the delegation of power to make the law, which necessarily involves the discretion as to what it shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law. The first can not be done. To the latter no valid objection can be made.' "

.It is unquestionably true that act No. 4 vests the Refunding Board with a wide discretion, not at all as to what the law shall be, but as to what shall be done in the execution of its provision. This must be true from the very necessities of the case. It would, for instance, be impractical for the General Assembly to negotiate and sell these bonds, or to negotiate and agree as to what interest rate they shall bear, although not beyond its power to do so. There is desired, of course, the most favorable interest rate obtainable; but this can only be done by inviting investors to bid for the bonds and to order, as the act does, that the board shall accept the offer most advantageous and least burdensome to the state.

That vesting this discretion in the Refunding Board is no delegation of legislative authority appears to be definitely settled by the opinion in the case of *Ruff* v. *Womack*, 174 Ark. 971, 298 S. W. 222. That case construed act 119 of the Acts of 1927, p. 358, entitled "An act creating a Revolving Loan Fund to aid needy school districts in repairing, erecting, and equipping necessary school buildings, and for other purposes."

That act authorized the State Board of Education to both borrow and to lend money, and to fix rates of interest to be paid and to be charged, and otherwise conferred many discretionary powers far greater than those conferred upon the Refunding Board by act No. 4. It was there contended that there had been a delegation of legislative power, but in overruling that contention it was there said: "The Revolving Loan Fund law providing for the sale of state bonds by the State Debt Board, for the purpose of borrowing money from permanent school fund, and for lending the money obtained to needy school districts by the State Board of Education, is not invalid as delegating legislative powers to either of these boards, as the power conferred is merely that of enforcing the law after making investigations."

The state must act through its officers and agents. It may not delegate to either power to enact laws, but it may, by laws properly enacted, direct its officers and

agents to perform certain duties, and these officers and agents must derive their powers from the legislative enactment, and not from their assertion or assumption of power to act; but it is not a delegation of legislative authority to permit the use of discretion in the discharge of the duties which the law making body has enacted and imposed.

The Refunding Board has not been given unlimited authority to act, nor any authority whatever to legislate, as its members have only such powers as have been conferred upon them; and they cannot, by any action of their own, enlarge these powers. There is a very definite restriction as to the interest rate they may agree to pay upon the bonds they are authorized to issue. Section 4 of the act provides that the bonds shall be in such form and denominations; shall have such dates and maturities; shall bear interest, payable semi-annually, at such rates (the rate on each issue to be sold to average less over the life of the issue than the average rate borne by the obligations to be redeemed with their proceeds over the life of such obligations);  .  .  .   as the board shall determine  .  .  ."

There is nothing in act No. 4 which imposes upon the state any new or additional obligation. The obligations of the state will not be increased. It is proposed only to make them more easy to bear and to discharge.

We are of the opinion also that § 21 of act No. 4 does not constitute a delegation of legislative authority to the people; nor is it violative of that provision of Amendment No. 7 which prevents the General Assembly from referring any measure to the people. Section 21 does provide that "No bonds shall be issued under this act except by and with the consent of a majority of the qualified electors of the state voting on the question at a special election called for that purpose." It is not intended by this provision to have the electors of the state determine whether act No. 4 shall be a law. It is now a law. Its purpose is, rather, to determine whether it is the will of the people that the provisions of the law shall be availed.

An act of the General Assembly was involved in the case of *Simpson* v. *Teftler,* 176 Ark. 1093, 5 S. W. 2d 350, which, by its terms, provided that its provisions should not be enforced until the consent of the landowners to be affected had been given at an election which the act provided should be called for this purpose. It was there contended that this reference to the people was in violation of the inhibition of Amendment No. 7 that ". . . no measure shall be submitted to the people by the General Assembly except a proposed constitutional amendment or amendments, as provided for in the Constitution." An adverse answer was given to this contention by quoting from the case of *Lemaire* v. *Henderson,* 174 Ark. 936, 298 S. W. 327, as follows: " 'The statute does not delegate legislative power, so long as it is complete in itself when it has passed the Legislature, even though it is left to a vote of the people when it shall come into operation. In the case at bar the law is complete in itself. It declares the result which may come from holding the election under its provisions. It is simply a case where the Legislature passed a complete statute, but made its enforcement depend upon the will of the people, to be expressed at an election called under the provisions of the act for that purpose."

The election provided for by § 21 has been called and held. As act No. 4 is in effect, the authority existed for calling it. The act confers that authority. This election will have been held before this opinion has been delivered, but the result thereof may or may not be officially determined by that time, and if the election is adverse to the bond issue, the matter is at an end. In that event the bonds may not be issued. The act would still be a law, but the electors had determined not to avail themselves of its provisions.

The case of *Gaster* v. *Dermott-Collins Road Imp. Dist.,* 156 Ark. 507, 248 S. W. 2, is cited to sustain the contention that this election may not be held at this time for the reason that the General Assembly is even now in session, and the act will not become effective until ninety days after the adjournment of the General Assembly. It was so held in the case just cited; but in that

case the act under which the election was held did not contain the emergency clause, and for that reason that act did not become effective until ninety days after the adjournment of the General Assembly. In other words, there could be no election until there was a law authorizing the election. But, here, we have a law with a valid emergency clause which is, therefore, now in effect, and which authorized the calling of an election.

The election for which the act provides is a special election, and is so designated in act No. 4. The act directs that the election shall be called by the Governor by proclamation, and that notice of the election shall be given by publication of the proclamation in one newspaper of general circulation in each county in the state not less than fifteen days prior to the day of the election. It is not alleged that the law has not been complied with in calling the election; and we think there is no question as to its validity.

It is insisted that act No. 4 impairs the obligation of the contract created between the state and the holders of the bonds issued under the authority of act No. 11 of the Acts of the Special Session of the 1934 General Assembly. Acts Special Session 1934, p. 28. Act No. 4 plainly expresses the contrary purpose. So far from attempting to repudiate its bonded road debt, the state has been making repeated and persistent efforts to pay. Act No. 4 contains the state's solemn pledge to pay, and expressly states that there is no intention to impair the obligations assumed by the state under act No. 11. Nor is the state attempting to make any remedy now existing for the collection of the debt created under act No. 11 less effective. The intention of act No. 4 is to make the payment more certain and effective. No holder of any of the state's highway obligations is required to surrender them except upon full payment of principal and interest. Payment of a debt is not repudiation, but is the fulfillment and discharge of the obligation.

It is alleged that § 8 of act No. 4 is void because it exempts bonds issued under the act from state income taxes. It is conceded, however, that this contention is

without merit in view of the decision of this court in the case of *Ward* v. *Bailey, Governor,* 198 Ark. 27, 127 S. W. 2d 272, where this exemption was upheld. It was also held in the case just cited that where the credit of the state, either expressly or impliedly, was pledged to the payment of indebtedness existing prior to the adoption of Amendment No. 20, such obligations may be refunded or new bonds may be sold and the proceeds applied in payment of the existing debt.

It is objected that a partial sale of the new bonds may affect and depreciate the market value of any outstanding bonds that may not be redeemed. This may be true, but it was held in the case of *Scougale* v. *Page,* 194 Ark. 280, 106 S. W. 2d 1023, that although the market value of the state's bonds may rise or fall, this has no bearing on the question of the impairment of the state's obligations, since there was and is no undertaking on the part of the state to guarantee any particular price for the bonds. The state's obligation is to pay the bonds and the interest thereon, and that is the purpose of act No. 4.

It is insisted that the plan of offering the bonds for sale will prevent competitive bidding, as required by § 7 of act No. 4. We find this contention to be without merit, inasmuch as § 7 requires that all bond sales shall be public, on sealed bids, after notice published not less than ten days before the day of sale in the news mediums specified in § 16 of act No. 11 of 1934. The bonds have not yet been offered for sale, and it must be assumed that when they are, the offer will be made in conformity to law. If not, complaint may then be made.

It is alleged that act No. 4 was not passed by the General Assembly in the manner provided by the Constitution; but no evidence is offered to sustain that allegation, and the records of both the House of Representatives and of the State Senate, of which we take judicial knowledge, reflect that the act was passed in both houses in the manner required by the Constitution.

It is alleged that § 1 of act No. 4 violates §§ 1 and 2, of art. 4, and § 10, of art. 5 and § 6, of art. 19, of the

Constitution, and is, therefore, invalid, because it provides that three senators and five representatives shall be members of the Refunding Board.

We are of the opinion that this objection is well taken, and that these members of the General Assembly are not eligible to serve as members of the board, because of their membership in the General Assembly which enacted the legislation.

It is thought to be contrary to both the spirit and the letter of the Constitution for the General Assembly to create an office or board or other state agency, and then to fill the place thus created with one or more of its own members. The recent case of *Oates* v. *Rogers, ante,* p. 335, 144 S. W. 2d 457, announces the policy of the Constitution and laws of this state to separate and keep distinct the departments of government.

Now, of course, the General Assembly has the right to appoint such committees or commissions, to be composed, in part or wholly, of its own members, to make investigation and report upon any matter related to the discharge of their legislative duties. But the discharge and performance of the details of act No. 4 is not a legislative matter. It was the sole province of the General Assembly to enact the law. It is the duty of the judicial department to construe it, and it will be the duty of the executive department to enforce it; and we think it is beyond the power of the General Assembly to confer executive powers upon its members, and we think the appointment of members of the General Assembly to membership on the Refunding Board is in contravention of the spirit, if not the letter, of the sections of the Constitution above referred to. The General Assembly has the power to name the persons, whether officials or not, who shall execute the laws it may pass. For instance, it was held in the case of *Cox* v. *State,* 72 Ark. 94, 78 S. W. 756, 105 Am. St. Rep. 17, that the act providing that the members of the Board of State Capitol Commissioners should be elected by the two Houses of the Legislature is constitutional. But it is a different matter to say that the Legislature might create a capitol or

other commission, and thereafter elect its members to the places created.

In a discussion of the sections of the Constitution above referred to Chief Justice BUNN in the case of *State* v. *Townsend,* 72 Ark. 180, 79 S. W. 782, 2 Ann. Cas. 377, said: "The object of these several provisions is to emphasize the fact that the officers and offices of the state are divided into three great classes, the legislative, the executive, and the judicial. And the further fact that a person cannot at the same time exercise the duties of more than one office in either of these departments; neither can he exercise the duties of an office in one of these departments, and at the same time those of an office in either one of the other two departments. It follows that, in so far as regards the offices contemplated in these provisions of the Constitution, there is a perfect and absolute inhibition against holding two offices at one and the same time, with the exception named in § 26, art. 19." The exceptions contained in § 26, art. 19, have no application here.

Although we are of opinion that the members of the Legislature—Senators and Representatives—named in § 1 of the act are not eligible to serve, that fact does not affect or invalidate the act, for the reason that § 23 thereof provides that "If any provision of this act is held unconstitutional it shall not affect the validity of the remainder of the act." Therefore, the remaining persons named in § 1 of the act will constitute the board with all the powers conferred upon it.

No one questions the validity and binding contract of the state to pay the obligations incurred under or pursuant to act No. 11 approved February 12, 1934; but to put that question at rest and beyond future controversy § 17 of act No. 4 expressly validates them. The General Assembly had this power, but its exercise has added nothing, in amount or otherwise, to the extent of the obligations of the state.

The point is urged that act No. 4 makes new pledges of highway revenues for purposes wholly different from those now served; that an additional $2,500,000 is pledged

annually for construction of new roads and mainte- nance, and that $750,000 is pledged annually to pay bridge improvement district bonds and interest, as identified by act No. 330 of 1939, and road district bonds and interest under act No. 325 of 1939, and municipal paving district bonds and interest thereon, etc. Under acts 325 and 330 of 1939 there was no general assumption, but merely appropriations for the fiscal period ending June 30, 1941. All that the new law does is to declare the public policy to apply $750,000 annually to the payment of the class of indebtedness identified, and to expend $2,500,000 from its own revenues in construction and maintenance of roads. What the state does with this reserve fund is not a matter which affects the validity of the bonds proposed to be issued. By accepting the bonds, the purchasers agree that the state may apply the reserve fund in the manner expressed. But it may not be so applied until, as § 12 of the act provides, the first $10,250,000 of highway revenue coming into the State Highway Fund in each fiscal year shall have been set aside for highway maintenance and debt service, in the proportion of 30 per cent. for highway maintenance and 70 per cent. exclusively for current debt service and the redemption of bonds.

The most that can be said in respect to the language of act No. 4 regarding the annual expenditure of $750,000 for the purposes mentioned in acts 325 and 330 is that it directs that the money shall be set aside. Before payments can be made, appropriations are necessary. It is not proposed that bonds be issued, hence amendment No. 20 has no application.

It is insisted that act No. 4 impairs the state's contractual obligation, in that § 22 authorizes the diversion of $40,000, or so much thereof as may be necessary, to defray the expenses of the special election for which the act provides. This money is first appropriated out of the General Revenue Fund to defray the expenses of the election. After the bonds authorized by the act have been sold or exchanged, it is made the duty of the State Comptroller and the State Treasurer to transfer from

the State Highway Fund to the General Revenue Fund a sum equal to the amount expended by the state for the expenses of the election, so that, finally, these expenses will be paid out of the State Highway Fund.

A somewhat similar use of highway funds to pay the expenses of refunding operations under the acts there discussed was held not to be an impairment of the state's obligations in the case of *Scougale* v. *Page,* 194 Ark. 280, 106 S. W. 2d 1023. Nor do we think that it does so here.

Two elections have been held on February 15th, or rather, at the election held on February 15th, two questions were submitted to the people, and it is insisted, for the reasons already discussed and others presently to be discussed, that there was no authority to hold either.

The first question voted on at the election was whether bonds should be issued; the second was whether the act should continue as a law. In other words, under the referendum provisions of the Constitution contained in amendment No. 7 the act was referred to the electors for their approval or rejection.

It is insisted that the provisions of § 4674, Pope's Digest, have not been complied with. That section reads as follows: ''Whenever a proposed amendment to the Constitution, or other question is to be submitted to a vote of the people, the Secretary of State shall, not less than eighteen days before the election, duly certify the same to the commissioners of each county in the state, and the commissioners shall include the same in the posting which they are by this act required to make, and also to print the same on the ballots.''

That section has not been complied with, for the reason that eighteen days had not expired between the date of the call for the election and the date on which it was held. But it is our opinion that this section does not apply to this special election. This section has reference to the general election at which time officers are elected and various questions are submitted to the electors. The purpose of this section is to advise the election

commissioners what these questions are, to the end that they may be placed on the ballot.

Act No. 4 provides what notice shall be given of this special election. Section 21 of the act provides that "The special election shall be called by the governor by proclamation, and notice of the election shall be given by publication of the proclamation in one newspaper of general circulation in each county in the state not less than fifteen days prior to the date of the election." It is this provision—and not § 4674, Pope's Digest—which applies and governs as to the manner in which the question of the approval of the bond issue shall be submitted to the people.

The other question to be voted upon is the one arising under the referendum on the act, and the vote upon that question will decide whether act No. 4 shall continue in force as a law.

It is provided in amendment No. 7 that any number, not less than six per cent. of the legal voters, may, by petition, order the referendum against any general act; but it is further provided in this amendment that ". . . Referendum petitions may be referred to the people at special elections to be called by the proper official and such special elections shall be called when fifteen per cent. of the legal voters shall petition for such special election. . . ." It is admitted that petitions containing the names of more than 64,000 electors have been filed with the Secretary of State, and that official has determined that this is many more names than is required to call a special election.

These petitions, therefore, confer authority to call the special election, and there appears to be no provision of the law fixing the time which shall lapse between the date upon which the notice of election is given and the date upon which it is to be held. We, therefore, hold that the special election, may be held upon reasonable notice. In view of the wide publicity given this legislation, and the great and general public interest in it, manifested by the fact that more than 64,000 electors, from every county in the state, have petitioned that a

special election be ordered, we hold that reasonable notice of the election has been given.

. It is objected that the Amendment No. 7 provides that the election shall be called by "the proper official," and that there is no designation of the Governor as that person. The answer to that objection is that it can be no person other than the Governor. No other officer has authority to call elections to be held in more than one county. Section 4679, Pope's Digest.

It is argued that inasmuch as the act has been referred to the people it will remain in abeyance for a period of thirty days after the election, and that no action can be taken under the act until the expiration of that time.

It is provided in the referendum clause appearing in Amendment No. 7 that, "If a referendum is filed against any emergency measure, such measure shall be a law until it is voted upon by the people, and if it is then rejected by a majority of the electors voting thereon, it shall be thereby repealed." In other words, the act is a law unless and until the people, upon a referendum, shall repeal it.

In another section of Amendment No. 7 it is provided that "Such measures shall be operative on and after the 30th day after the election at which it is approved, unless otherwise specified in the act." The insistence is that the measure having been referred to the people, it cannot and does not become a law until thirty days have expired after the date on which the election is held. But this is not true, if it is otherwise specified in the act, and act No. 4 otherwise specifies. Its specification on this subject is that it shall be a law when approved by the Governor, the emergency clause having been attached. That being true, the act continues in force and effect notwithstanding the election unless, indeed, the electors have, by their votes, repealed the law.

As appears from the caption of this case, the taxpayer and bondholder has brought two suits, the first having been filed before the special election was called and the referendum ordered. In the second suit it is

prayed that the State Treasurer be enjoined from paying the expenses of the election for the reason that the power to hold it is absent. But, if act No. 4 is now the law, and it is if it has a valid emergency clause—and we hold that it has—the authority exists, for the reasons herein stated, to hold both elections, one to determine whether bonds shall be issued, the other whether the law shall be repealed by the electors.

Under the views herein expressed, there is no constitutional objection to holding the election or lack of statutory authority to do so.

.The briefs of the appellant taxpayer raise many questions and objections to the holding of the election, all of which have been considered and found to be without merit.

The decrees of the court below, dismissing both complaints as being without equity, are, therefore, affirmed.

Immediate mandate ordered.

GRIFFIN SMITH, C. J., concurs in part.

GRIFFIN SMITH, C. J., (concurring in part in the result). I agree that the Refunding Act is now valid, but reach that conclusion by a process of reasoning sharply at variance with the opinion of my colleagues.

In *Matthews* v. *Bailey, Governor,* 198 Ark. 830, 131 S. W. 2d 425, there is this headnote: "An Act of the legislature which authorizes a governmental agency or officer to irrevocably pledge specific resources of the state creates a vested interest notwithstanding the fact that the pledge is not effective until the agency or officer has moved to effectuate the legislative intent or purpose, and the provisions of Amendment No. 7 to the constitution prohibiting the declaration of an emergency with respect to such legislation are not rendered inoperative merely because the offer to sell bonds secured by the pledge of such revenues has not been accepted."

Section 16 provides that the act of 1941 shall constitute a contract between the state and its bondholders

"which shall never be impaired." The commitments authorized to be made definitely pledge revenues of the state.

In the Matthews Case it was said: "Measures carrying the emergency clause may be referred, but the law is in force until an adverse vote has been registered by the people in the manner provided by the amendment. But, as appellees have pointed out, under Amendment No. 7 the people were given the right to vote on an act authorizing the issuance of refunding bonds, and that right exists because an act creating vested interests is not subject to the emergency clause, and because refunding bonds which pledge revenues in trust, executed under the plan of act No. 4 (of 1939) are sustained by vested interests. If the bonds were not so secured there would be no purchasers, and an attempt to refund would be futile."

To avoid effect of this decision the 1941 act is wrapped in a verbal shroud intended to prevent the constitutional right hand from knowing what the legislative left hand has done. The expression is: "This act shall not create any right of any character, and no right of any character shall arise under or pursuant to it, unless and until bonds authorized by this act shall have been issued and actually sold or exchanged by the board."

Under today's decision this "message to the court" transmutes into imperative law that which but for a dogmatism judicially accepted could have no greater significance than ordinarily attaches to extravagant language adroitly utilized. A declaration by the general assembly that Arkansas is wholly uninhabited would not have the effect of immediately exterminating the state's population; nor should the assertion in an act that it shall not create any rights (when in fact under it vested interests may accrue) be adopted by the court, to the end that we may rid ourselves of a constitutional impediment which proponents of refunding under the present plan resorted to for the purpose of avoiding refunding through a former plan.

It is said in the prevailing opinion, however, that the restraint in § 21 of act 4 against issuing bonds without

approval (to be expressed at an election called for that purpose) distinguishes it from act 4 of 1939; that the limitation operates in some mysterious way *to render effective on condition* a procedure we have heretofore sa:d was void from the beginning. If it be true, as a majority of the court held in the Matthews Case, that an emergency cannot be declared in respect of any legislation in consequence of which (by immediate or remote conduct of any designated agency) a vested interest may be created, then by the same reasoning the election provided for by § 21 was without authority because act 4 did not become a law until on reference it was approved; yet, in effect, it is held that the want of power is no impediment in the instant case. This is so only because the authority denied by the constitution has been supplied by judicial reversal, for which there is no justification and no explanation other than the inference of expediency wh:ch necessarily attaches.

But the want of power to hold a valid election under act 4 is not fatal to refunding; neither does it impair the movement except slightly in point of time—and that is immaterial.

Constitutional Amendment No. 7 provides that ". . . referendum petitions *may* be referred to the people at special elections to be called by the proper official, and such election *shall* be called when fifteen per cent. of the legal voters shall petition for such special election. . . ."

There is the further provision that "Any measure submitted to the people as herein provided shall take effect and become a law when approved by a majority of the votes cast upon such measures, and not otherwise, and shall not be required to receive a majority of the electors voting at such election. Such measure shall be operative on and after the thirtieth day after the election at which it is approved, unless otherwise specified in the act."

It will be observed that the language of Amendment No. 7 is that "referendum petitions" *shall* be referred to the people at a special election to be called by the proper

official when fifteen per cent. of the voters shall have made demand. There is no right to have initiated measures or constitutional amendments voted upon other than at regular elections. From this distinction it is clear that Amendment No. 7 was intended to provide the people with expeditious facilities for approving or disapproving that class of measures it might be thought would vitally affect them, one of which is an act creating vested interests.

The opinion holds that act 4 became a law when the bill was approved by the Governor, but says that § 21 is controlling as to issuance of bonds. Therefore, for all practical purposes, even from the majority's viewpoint, the refunding law acquired a workable legal status immediately after February 15. It is my belief that the law's life relates to the referendum election called by the Governor and held February 15, and not to the election held the same day pursuant to § 21.

The General Assembly was without power to refer act 4. The public expression, treated as such and not as an election, emphasizes the attitude of the people. It reflects complete confidence in the means by which refunding is to be attained.

The question has been asked: If the emergency clause is invalid, by what authority does act 4 take effect without further delay? The answer is that the legislative intent has been expressed against delay, and the 30-day period mentioned in Amendment No. 7 has been "otherwise specified."

The majority opinion holds that § 4674 of Pope's Digest is not applicable to special elections. I do not agree. But the requirements are directory. There was no request that either of the elections be enjoined. *Wheat* v. *Smith,* 50 Ark. 266, 7 S. W. 161, is authority for holding that the result should not be nullified. As was said in the Wheat-Smith Case, "The voice of the people is not to be rejected for a defect or want of notice, if they have in truth been called upon and have spoken."

I agree with the majority opinion in the following respects:

(1)    The Refunding Act is now a law.

(2)    Amendment No. 20 to the constitution is not involved.

(3)    Powers delegated to the refunding board are not legislative.

(4)    Obligations of the state are not increased.

(5)    The Governor was the "proper official" to call an election under the referendum petitions.

(6)    There is no impairment of the obligation of contracts between the state and the holders of its bonds.

(7)    Bonds exempt from the state income tax may be issued.

(8)    The plan for selling bonds tends to promote, rather than to prevent, competitive bidding.

(9)    The General Assembly complied with all necessary constitutional requirements in "passing" act No. 4.

(10)    State senators and members of the house of representatives are ineligible to serve on the refunding board, for the reasons stated in the court's opinion. I think, however, it should be made clear that the lieutenant governor belongs to the executive department. Amendment No. 6 to the constitution. It is true the lieutenant governor presides over the senate and may vote in case of a tie. But Amendment No. 6 expressly states that the executive department of the state shall consist of a governor, lieutenant governor, and the other officials named.

(11)    Act No. 11 of 1934 was a measure under which valid contracts between the state and its creditors arose. Its validation was not beyond the power of the General Assembly, but adds nothing to it.

(12)    The General Assembly had power to appropriate $40,000 to defray the expense of an election, or elections. Amendment No. 19 to the constitution prohibits enactment of appropriation bills until the appropriation bill provided for in § 30 of art. 5 of the constitution has been passed. The amendment uses the words,

"appropriations for any biennial period." The record upon which the appeal before us is based does not show whether the general appropriation bill had been "enacted" when the $40,000 appropriation was made. This court has not construed Amendment No. 19 in a controversy testing whether an appropriation for a special purpose (having no relation to the biennium) may be made before the general appropriation bill has been enacted.

(13) In respect of a diversion of highway revenues and consequent violation of act No. 11 of 1934, *et seq.*, I dissented in *Scougale* v. *Page,* 194 Ark. 280, 106 S. W. 2d 1023. If the diversion of $382,783.46 was of no consequence in 1937, repayment to general revenue of $40,000 from highway revenues in 1941 should not cause concern. *De minimis non curat lex.* The Scougale Case has not been overruled and of necessity I adhere to it. But aside from that case I think the appropriation of $40,000 becomes a part of the expense of refunding. The question can only be raised by an injured party whose security has been impaired.