Fort Smith Couch & Bedding Company *v.* Rozell.

4-6475                                    155 S. W. 2d 707

Opinion delivered November 17, 1941.

*Paul E. Gutensohn* and *Warner & Warner,* for appellant.

*Lyman L. Mikel* and *Partain & Agee,* for appellee.

Smith, J.   Appellee recovered a judgment for $3,500 to compensate a slight injury, and five points are urged here for its reversal: (a) that appellants, defendants below, were not negligent; (b) that appellee assumed the risk of his injury; (c) that he was guilty of contributory negligence; (d) that the verdict is excessive; and (e) that the court was without jurisdiction to try the case.

The testimony, viewed in the light most favorable to appellee, is to the following effect.  Appellant, Fort Smith Couch & Bedding Company, hereinafter referred

to as the company, is engaged in the manufacture of chairs, its plant for that purpose being located in Fort Smith, Sebastian county, Arkansas; John Elkins, one of its employees, resides in Crawford county, and was sued, with the company, in Crawford county. Process was served upon Elkins in Crawford county, after which a summons was served upon the company in Sebastian county.

.It was Elkins' business to make covers and panels for the chairs. He ran out of material, and it became necessary for him to go to the millroom to replenish his supply. On the way there he had to pass through an aisle, on the opposite sides of which chairs had been stacked. The chairs were of two sizes—one, No. 203, being the larger; the other, No. 202, the smaller. The No. 203 chairs had an over all width from arm to arm of 36 inches; the other a width of 34 inches. It was Elkins' duty to stack the chairs in the storeroom, on the opposite sides of the aisle which ran through it. Appellee had no duty in this respect, and was, of course, under no duty to inspect the manner in which the chairs had been stacked. It was customary to place 4 chairs of the same size in a stack, and this was the proper and careful manner in which to stack them.

As appellee walked down the aisle a pile of these chairs toppled over, and one of them fell on him, inflicting the injury for the compensation of which he sued. This pile was five chairs high. The two bottom chairs were No. 202, the smaller size, while the three top chairs were No. 203, the larger size.

This testimony is sufficient to support the finding that there was negligence in the manner of stacking the chairs, and that they would not have fallen had they been properly stacked.

As has been said, appellee had no duty to perform in stacking the chairs, nor was it his duty to see that they had been properly stacked. His testimony was that as he walked down the aisle, as his duty required him to do, he did not touch the chairs. We conclude, there-

fore, that the jury was warranted in finding that he was not guilty of contributory negligence.

We are of the opinion also that the jury was warranted in finding that he did not assume the risk, as the danger of the chairs falling was not so open and obvious that he must have been aware of that danger.

But the verdict is so grossly excessive that it must be reduced to a sum which will reasonably compensate the injury sustained.

Appellee was injured November 5th. Summons was served upon John Elkins, November 7th, and upon the company November 8th. On November 26th both the company and Elkins appeared specially and moved to dismiss the action, upon the ground that the venue was in Sebastian county, the allegation being that act 314 of the Acts of 1939, p. 769, the Venue Act, was then in force, and operated to change the venue of the case to Sebastian county, where the plaintiff resided and where the injury occurred. On November 29th, the company and Elkins filed their joint answer, denying all the allegations of the complaint and setting up the defenses above mentioned, reserving their motion to quash the summons. On the same day the case came on for trial.

It thus appears that only 24 days elapsed between the date of the injury and the date of the trial, and the service of process had barely ripened.

Appellee alleged an injury both to his back and to his wrists. Immediately after the injury appellee was sent by the company to Dr. Wolferman, its physician, for treatment. Appellee admitted that no other physician had treated him. Dr. Wolferman testified as follows: ". . . he (Rozell) was pretty much upset and stated that a chair had fallen on him, had fallen on his shoulder and was knocked to the floor and injured his left wrist and that was his main complaint, of severe pain on the left wrist, on the left side; in taking off his clothes, he had on a belt over the sacro-iliac, a belt to support the back and I naturally wanted to know about that and he said he had had a previous injury, which hurt his back and that it was still giving

38

him some pain and I went carefully into that when he said it was giving him pain at that time and examined his back and I didn't find anything directly to account for his statement of tenderness over that region, but he was quite tender in the left wrist joint. I took a picture of that and couldn't show any fractures, there were no fractures shown on the X-ray picture in either the wrist or the arm or hand and this tenderness I diagnosed as a sprained wrist and gave him some medicine and told him to go home. . . . he came back to the office I think on the 6th and I showed him the X-ray pictures the next day and I asked him more about the back because he said he had had a previous injury and I felt I should know what that trouble was and I took the X-ray then the next day of the back to see if I could show any bone disturbance and the X-ray showed none whatsoever; I kept his wrist in a splint I think for about fifteen days, on account of the sprain, and started treating him with heat diarrhemia—electric heat—because he still said his back was painful; he had nine treatments, the last one November 27th, two days before the trial."

On his cross-examination Dr. Wolferman was asked: "How long would a man who had a fracture in the wrist have to carry that in a sling?" He asked: "Have you specified which bone in the wrist?" And the attorney answered: "One of the carpal bones." The doctor answered this question by saying: "It varies with different bones, some of them as long as eight weeks' disability and a fracture of trapezoid usually heals in from five to six weeks."

Dr. Wolferman further testified that he removed the sling, as there was no occasion for the patient to use it further, and that the patient was able to do his work two or three weeks after the accident.

Appellee was entirely satisfied with Dr. Wolferman's treatment, because he had no other doctor to treat him.

Dr. J. L. Post was called as a witness by appellee. This doctor admitted that he had never treated appellee, but stated that he had examined him the day before

the trial for the purpose of testifying as a witness in the case.

It appears from the testimony of both of these physicians that appellee has a back injury, the nature and extent of which need not be considered, as it is certain that it existed before the chair fell on appellee and was not aggravated by that incident.

Dr. Post admitted that he was not an expert in making and reading X-ray pictures, that he had no X-ray machine, and did not do X-ray work, but he testified that he had had the experience and training essential to read and interpret those pictures, and he discovered a fracture in the X-ray picture which Dr. Wolferman testified was not shown in the picture, and did not exist. We must—and we do—assume that this conflict in the testimony of the doctors was resolved in favor of Dr. Post and that there was a fractured bone in appellee's wrist, but the injury was so recent that the permanent nature and effect thereof would be in doubt except for the fact that Dr. Wolferman testified that he had advised appellee, as a patient, that he (appellee) could return to work in four weeks after his injury with a disability like a sprained wrist.

We conclude, therefore, that the verdict is excessive, and that the testimony does not support a recovery in any sum exceeding $1,000. We think the testimony supports the finding that there was an injury, and that appellants are liable therefor, but that any recovery in excess of $1,000 would be excessive, and not supported by the testimony; but this error will be cured by reducing the judgment to $1,000. *Coca-Cola Bottling Co.* v. *Carter, ante* p. 1026, 154 S. W. 2d 824.

It is insisted that the judgment should not be affirmed for any sum, for the reason that the court was without jurisdiction to try the case, as act 314 of the Acts of 1939, p. 769, commonly referred to as the Venue Act, was then in full force, and that the effect of this act was to change the venue of the action to, (1) the county where the injury occurred, or (2) to the county in which the appellee resided at the time of his injury,

40

which would be Sebastian county, as the injury occurred and the plaintiff resided in that county. The cases of *Fort Smith Gas Co.* v. *Kincannon, Judge, ante* p. 216, 150 S. W. 2d 968, and *Terminal Oil Co.* v. *Gautney, Judge, ante* p. 748, 152 S. W. 2d· 309, are cited to support this contention.

In the first of these—the Gas Company case—the plaintiff, a resident of Sebastian county, was injured in that county, and brought suit to compensate his injury in Crawford county. Prohibition was prayed, and granted by us, upon the ground that act 314 became effective on December 5, 1940, which was thirty days after the election at which the act was approved upon the referendum ordered against it, at the general election previously held on November 5, 1940.

The question there involved was whether act 314, after it became effective, applied to a pending suit in which the service had been properly obtained under the provisions of § 1398, Pope's Digest, before the act was in effect.

We held that § 1398, Pope's Digest, had been modified by act 314 to the extent of rendering § 1398 inapplicable to the cases to which act 314 applied, and that while cases in which service had been obtained under § 1398 would not be abated, the venue of such· cases would be changed to conform to act 314. That holding was reaffirmed in the Gautney case, *supra.*

Here, the judgment from which is this appeal was rendered prior to December 5, 1940, and the question now presented is whether act 314 was then in effect. In other words, did act 314 become effective on the date of the referendum, or thirty days thereafter?

*Fulkerson* v. *Refunding Board of Arkansas,* 201 Ark. 957, 147 S. W. 2d 980, is cited to support the contention that the act became effective from and after November 5, 1940, the date of the referendum election. It was said in that case ·that "In another section of amendment No. 7 it is provided that 'Such measures shall be operative on and after the 30th day after the election at which it is approved, unless otherwise specified in the act.' The

insistence is that the measure having been referred to the people, it cannot and does not become a law until thirty days have expired after the date on which the election is held. But this is not true, if it is otherwise specified in the act, and act No. 4 otherwise specifies. Its specification on this subject is that it shall be a law when approved by the Governor, the emergency clause having been attached. That being true, the act continues in force and effect notwithstanding the election unless, indeed, the electors have, by their votes, repealed the law.''

But it must be remembered that the emergency clause to the Bond Refunding Act was adopted by the vote required by the Constitution for that purpose, whereas the emergency clause to the Venue Act was not adopted. As passed, the Venue Act was without an emergency clause, and when referred to the people it did not become a law until thirty days had expired after the date on which the election was held, because it was not otherwise specified, as was the case with the Refunding Act.

There was passed at the same 1939 session another act, No. 319, p. 777, known as the Workmen's Compensation Act, which contained no emergency clause. It, like act 314, was an act passed without an emergency clause. Both acts were referred in the November, 1940, election, and both acts were adopted by the people at that election, but no one contended that act 319 became effective until thirty days after the election, and no attempt was made to proceed under its provisions until after the expiration of that thirty-day period.

Having no emergency clause, we conclude that act 314, like act 319, did not become effective until December 5, 1940, and as the trial from which this appeal comes occurred prior to that date, the case of *Fort Smith Gas Co.* v. *Kincannon, supra,* does not apply.

The judgment of the court below will, therefore, be modified and affirmed as herein indicated.