CLAYTON, STATE TREASURER *v.* CITY OF LITTLE ROCK.

4-7956                                        204 S. W. 2d 145

PAVING IMPROVEMENT DISTRICT No. 1, OF BRINKLEY
*v.* CLAYTON, STATE TREASURER.

4-8059

CITY OF JONESBORO *v.* CLAYTON, STATE TREASURER.

4-8205

Opinion delivered June 23, 1947.

Rehearing denied September 22, 1947.

895

*Guy E. Williams*, Attorney General and *Cleveland Holland*, Assistant Attorney General, for appellant.

*Cooper Jacoway*, *Marcus Fietz, T. J. Gentry, Jr.*, and *Wm. J. Kirby*, for appellee.

*A. M. Coates, Marvin B. Norfleet, Mann & McCulloch, Daggett & Daggett, Burke & Burke, Norton & Norton, W. W. Sharp, Caudle & White* and *O. E. Westfall*, amici curiae.

4-8059

*Cooper Jacoway, Marcus Fietz, Wood & Smith, W. W. Sharp, M. B. Norfleet, Norton & Norton, Mann & McCulloch, Daggett & Daggett, Burke & Burke, A. M. Coates* and *O. E. Westfall*, for appellant.

4-8205

*Cooper Jacoway, Marcus Fietz* and *Wood & Smith*, for appellant.

*Reece Caudle, Robt. J. White, W. W. Sharp, A. M. Coates, O. E. Westfall, M. B. Norfleet, Norton & Norton, Mann & McCulloch, Burke & Burke* and *Daggett & Daggett*, for appellee.

ED F. McFADDIN, Justice. In this court, three cases (Nos. 7956, 8059 and 8205), have been consolidated, and will be decided in this opinion. We will refer to the cases by the number in this court, and will refer to the parties by convenient designations, and leave for footnote the detailing of the parties. First, we will give a

brief history of each case and the questions therein which we find necessary to decide; and then we will decide the questions.

## Case No. 7956

The City of Little Rock was the original plaintiff, but a number of cities and counties[1] later joined as plaintiffs in the Pulaski Chancery Court against Vance Clayton as State Treasurer and J. Oscar Humphrey as State Auditor, to require the state officers to pay over certain moneys to the plaintiffs. The suit was filed August 28, 1945. We will at all times refer to these plaintiffs as the "cities and counties"; and we will at all times refer to the said state officers, as "state officials." In the complaint and interventions, the cities and counties alleged that the state officials had been keeping the books of, and disbursing, the highway funds on a "bond-year" basis of April 1 to March 31, rather than on a "fiscal-year" basis of July 1 to June 30; that the recasting of the highway accounts for the two fiscal years, July 1, 1943, to June 30, 1945, would result in the

[1] The intervening cities which joined as plaintiffs were: Ashdown, Augusta, Berryville, Biggers, Brinkley, Buckner, Calico Rock, Camden, Cammack Village, Clarendon, Cotton Plant, Crossett, Decatur, DeValls Bluff, Earle, Edmondson, El Dorado, Fayetteville, Fordyce, Forrest City, Fort Smith, Fulton, Gentry, Green Forest, Harrisburg, Helena, Hope, Hughes, Joiner, Leachville, Lepanto, Levy, Lewisville, Lincoln, Lockesburg, Malvern, Marianna, Marvel, Mayflower, Mena, Monticello, Mt. Ida, Nashville, Newport, Norphlet, North Little Rock, Osceola, Palestine, Paragould, Paris, Pea Ridge, Pocahontas, Rogers, Russellville, Searcy, Siloam Springs, Springdale, Stuttgart, Strong, Success, Texarkana, Walnut Ridge, West Memphis, Wynne, Van Buren, Jonesboro, Parkin, Dumas, Eudora, Murfreesboro, Huntington, Hartford, Humphrey, Charleston, Okolona, Dierks, Coal Hill, Waldron, Huntsville, Emerson, Arkansas City, Newark, Mansfield, Piggott, Hampton, Eureka Springs, England, Atkins, Clarendon, Stephens, Bald Knob, Hardy, Western Grove, Corning, Salem, New Rocky Comfort (called "Foreman"), Smackover, Nettleton, Marked Tree, Mountain View, Pangburn, Hoxie, Monette, Manila, Sheridan, Rison, Stuttgart, Mammoth Springs, Gould, Hazen, Dyer, McCrory, Gurdon, Melbourne, Benton and Lake City. The intervening counties which joined as plaintiffs were: Craighead, Grant, Lincoln, Ashley, Sharp, Saline, Scott, Calhoun, Izard, Sevier, Miller, Benton, St. Francis, Nevada, Pope, Sebastian, Stone, Ouachita, Perry, Yell, Independence, Lawrence, Dallas, Arkansas, Drew, Jackson, Marion, Little River, Hot Springs, Greene, Crittenden, Cleburne, Clay, Boone, Hempstead, Pike, Washington, Franklin, Chicot, Crawford, Bradley, Desha, Van Buren, Lee, Cleveland, Fulton, Conway, Jefferson, Johnson, Prairie, White, Pulaski, Searcy, Clark, Newton, Mississippi, Garland, Howard, Poinsett, Faulkner, Cross, Randolph, Madison, Columbia, Woodruff, Monroe, Union, Polk and Phillips.

cities and counties receiving certain funds under Act 4 of 1941 and Act 385 of 1941, which funds would be withheld from the cities and counties under the calculation of the "bond-year" basis. The complaint detailed the funds and beneficiaries so affected, and prayed for relief in keeping with the allegations of the complaint and interventions. The state officials (being the only defendants) answered by general denial; and a trial resulted in a decree in favor of the cities and counties. From that decree, the state officials appealed to this court. Here, certain municipal improvement districts[2] sought to intervene. We will refer to these at all times hereinafter as "municipal improvement districts." Their attorneys did in fact file a brief *amici curiae* in this court. The municipal improvement districts sought to urge in this court that Act 288 of 1943 was the reason why the cities and counties should not prevail. This last-mentioned act had evidently been overlooked by all parties in the trial of case 7956 in the chancery court. One question to be decided in this case 7956 will be discussed in topic heading I, *infra, i. e.,* "Bond-Year v. Fiscal Year." Another question is discussed in topic heading II, *infra, i. e.,* "Time of the Distribution of the Gratuity Money." Apprehensive lest the urging of Act 288 of 1943, in this court for the first time in case 7956 might be a "changing of the issues on appeal," the municipal improvement districts secured a delay of the submission of case 7956, in order to commence another action (which they did, and which is case No. 8059).

## *Case No. 8059*

In this case, the municipal improvement districts, as plaintiffs, filed a mandamus action in the Pulaski Circuit Court on August 9, 1946, against the state of-

[2] Paving Improvement District No. 1 of Brinkley, North & South Washington Street Improvement District No. 1 of Forrest City, East Jackson Street Improvement District No. 1 of Forrest City, Paving Improvement District No. 4 of Marianna, Street Improvement District No. 3 of West Helena, Paving Improvement District No. 5 of Camden, Paving Improvement District No. 6 of Camden, Street Improvement District No. 11 of Russellville, Street Improvement District No. 11, Annex No. 1, of Russellville, Street Improvement District No. 11, Annex No. 2 of Russellville, West Jackson Street Improvement District No. 2 of Forrest City.

ficials, to require payments of certain amounts claimed to be due to the municipal improvement districts under Act 288 of 1943. The state officials filed answer, stating that they had been ordered by the Pulaski Chancery Court (in the case now 7956 in this court) to pay the said moneys to the cities and counties. To this answer, the plaintiffs filed a demurrer which was overruled, and the plaintiffs stood on their demurrer, and final judgment was rendered sustaining the answer and dismissing the complaint. This appeal ensued. So, the municipal improvement districts are appellants in case 8059, and the state officials are appellees. In the circuit court, the cities and counties sought to intervene, but such intervention was denied them, and they have appealed as "appellants-interveners." Case 8059 will be disposed of in the disposition of the issues in the other two cases.

### Case No. 8205

In this case, the cities and counties filed suit in the chancery court on August 30, 1946, against the state officials, alleging that the state officials would distribute the state funds under Act 288 of 1943. unless enjoined and restrained; that such distribution would be injurious to the cities and counties; that said Act 288 of 1943 was null and void, and the state officials should be enjoined from proceeding under said act. The municipal improvement districts intervened in the suit, and claimed that the Act 288 of 1943 was valid, and that the state officials should make distribution under said Act 288. The case was tried in the chancery court on a stipulation of facts, and resulted in a decree upholding Act 288 of 1943. From that decree, the cities and counties have appealed, and the municipal improvement districts are the real appellees. One of the questions to be decided in this case is discussed in topic heading III, *infra*, "Validity and Effect of Act 288 of 1943." Another question to be decided in this case is discussed in topic heading IV, *infra*, entitled "Sufficiency of 1945 Appropriation Act." All three of these cases—in the final analysis—are controversies between the cities and the counties, on the one side, and the municipal improvement districts, on the other side.

OPINION

I. *Bond Year* v. *Fiscal Year.* The decision of this point requires a thorough study of Act 4 of 1941 (commonly known as the 1941 Refunding Act), and also of the cases construing that act, particularly: *Fulkerson* v. *Refunding Board,* 201 Ark. 957, 147 S. W. 2d 980 and *Page, Treasurer* v. *Street Improvement Dist. No. 11 of Russellville,* 203 Ark. 657, 158 S. W. 2d 905.

Section 12 of Act 4 of 1941 (as subdivided by capital letters A to D, inclusive), reads:

"When all the outstanding obligations eligible for refunding hereunder have been redeemed or exchanged, or funds have been set aside in the state treasury for their redemption or payment, all the bonds issued under this act shall be on a parity as to security, and in all other respects except as may be provided in the face of the bonds, and shall be governed by the following provisions and by the provisions of Act No. 11 not inconsistent therewith:

"A. The first $10,250,000 of highway revenue as it comes into the State Highway Fund in each fiscal year shall be set aside for highway maintenance and debt service, in the proportion of 30% for highway maintenance and 70% exclusively for current debt service and the redemption of bonds;

"B. after provisions of § 3 of Act No. 11, approved April 1, 1938, have been fulfilled, then, the next $2,500,000 shall be set aside for the construction of new roads and maintenance of State highways;

"C. and the next $750,000 shall be set aside for the payment of bridge improvement bonds and interest thereon which come under Act No. 330 of 1939; the payment of road district bonds and interest thereon which come under Act No. 325 of 1939; the payment of outstanding bonds and interest thereon issued by the municipal paving districts organized prior to January 1, 1939, which represent the cost of paving, gutters, curbs and aprons on streets and intersections forming a continuation of state

highways through such municipalities; the payment of outstanding bonds and interest thereon issued by improvement districts for the construction of bridges across navigable streams in the state; and for aid to cities and towns for the construction, repair and maintenance of streets and county roads in and immediately adjacent to such cities and towns—as the Legislature may from time to time prescribe.

"D. The highway revenues coming into the State Highway Fund in any fiscal year not specifically allocated to the foregoing purposes may be used for the construction of new roads, for maintenance, or for calling in and redeeming bonds under section 5 of this act, as the Legislature shall determine."

The paragraphing and adding of the capitalized letters A to D in the above quotation are for convenient reference to subdivisions of this section in the subsequent discussions contained in this opinion.

No party in any of these cases is attempting to claim or touch in any way the $10,250,000 in subdivision A, above, or the $2,500,000 in subdivision B, above. This litigation concerns the distribution of the $750,000 per annum referred to in subdivision C of § 12 above; and we will hereinafter refer to this $750,000 as the "gratuity money," and this subdivision C as the "gratuity section," since the beneficiaries of any and all of the $750,-000 receive the same as a gratuity from the state after subdivisions A and B have been achieved and satisfied.

When are subdivisions A and B achieved and satisfied? That is, when, each year, does the state begin calculating the $10,250,000 for subdivision A and the $2,500,000 for subdivision B in order to see how much—if any—will remain in any such year for subdivision C? That is the question. Section 24 of Act 4 of 1941 says:

"It has been found, and is hereby declared by the General Assembly . . .; that an opportunity to take advantage of this favorable market will be afforded on April 1, 1941, upon which date a large amount of the bonds eligible for refunding under the provisions of this

act may be called for redemption according to their terms; that the refunding under this act will confer rights upon the state which it does not now possess and will release funds for use in the maintenance and construction of state highways which are badly needed; . . .''

This quoted language indicates rather clearly that the Legislature intended that on April 1, 1941, bonds would be issued and sold under Act 4, and that the proceeds of said bonds could be used to the state's immediate advantage. Section 4 of Act 4 of 1941 says:

''The bonds shall be in such form and denominations; shall have such dates and maturities; . . . and shall contain such provisions as to registration of ownership as the board shall determine . . .''

Section 3 of Act 4 says:

''The bonds issued under this act shall be the direct obligations of the State of Arkansas, for the payment of which, both principal and interest, the full faith and credit of the state and all its resources are hereby irrevocably pledged.''

Section 8 of Act 4 provides, in part:

''The highway revenue shall be provided and shall remain pledged as a trust fund as provided in Act 11, and such covenant and pledge, and all provisions, limitations and covenants of that act, except as provided in § 12 hereof, shall innure to the bonds issued under this act, . . .''

Section 13 of Act 4 provides:

''The state expressly covenants that so long as any of the obligations authorized by this act are outstanding, it will not permit the present laws to be repealed or amended so as in any manner to reduce the *annual* revenue coming into the state highway fund below $10,-250,000.'' (Italics our own).

These quoted sections from Act 4 of 1941 demonstrate that the Refunding Board had the right to date the bonds

as it desired; and that when the bonds were issued, the highway revenue stood as a trust fund for the bonds— saving only the gratuity payments in subdivision C of § 12 and any other provisions in § 12 of said Act 4; and that the "annual revenue coming into the state highway fund" was to be calculated in accordance with § 12 of that act. It is shown in this case that the Refunding Board—acting under its broad powers contained in said Act 4—adopted a resolution in March, 1941, and, acting on that resolution, issued, under said Act 4, bonds in the amount of $136,330,557.29; that the bonds were dated April 1, 1941; and that the Refunding Board fixed April 1 to March 31 as the year on which the annual revenue was to be calculated and determined under said Act 4. The Refunding Board's resolution specifically said that "fiscal year" as used by the Refunding Board in the issuance of the bonds meant April 1 of one year to March 31 of the following year.

When we consider all of these facts, we reach the conclusion that, to place a construction on said Act 4 that would change the year from the bond year (April 1-March 31) to the fiscal year (July 1-June 30) would (a) certainly be at variance with the original intent of the Legislature to leave the determination of the year to the Refunding Board, and (b) might, in letter if not in spirit, be considered a breaking of faith with the creditors of the state who hold the refunding bonds. No party to this litigation indicates—much less claims—that such latter eventuality is to be even remotely considered. In determining how much revenue comes, each year, into the gratuity fund of $750,000 under subdivision C of § 12 of said Act 4, we must use as the time for calculation, the year beginning April 1 and ending the following March 31. That year, which we call the bond year, must be used to fix the period in which the revenue arises to go into the gratuity fund of $750,000; because, until subdivisions A and B of § 12 have been reached and accomplished, there is nothing to go into subdivision C. Since the year of April 1 to March 31 following is the "annual revenue year" for subdivisions A and B in § 12, it necessarily follows that the same period of time must

be used in calculating the "annual revenue" for subdivision C of § 12. Thus, the gratuity money *arises* in the period from April 1 of one year to March 31 following.[3]

But that year (which we call the bond year) does not determine when the gratuity fund shall be distributed, because the distribution requires a separate appropriation act. The distribution may be made by the Legislature by an appropriation act based on the bond year, or the fiscal year, or any other year that the Legislature may determine, within Constitutional limitations. But from March 31 of any year until distributed, or until the end of the legislative power under the Constitution, the money going into the gratuity fund remains in the treasury awaiting a valid appropriation act. This will be observed later, and this time of distribution will be discussed in topic heading II, *infra*.

The cities and counties contend that the fiscal year—July 1 to June 30—should be used in determining the period in which the annual revenue arises under the refunding act; and, since our holding on this point is adverse to the cities and counties, we notice their contentions.

A. The cities and counties urge that a decree of the Pulaski Chancery Court rendered in 1943 makes the question *res judicata* in favor of the cities and counties. In 1943, the City of Little Rock brought a class suit in the Pulaski Chancery Court against Earl Page, Treasurer of the State of Arkansas. We refer to this as the "1943 suit," and the decree rendered in that suit as the "1943 decree." The complaint in that suit alleged that, under § 12 of Act 4 of 1941 the amount of $750,000 was set aside for various state uses, and that by Act 385 of 1941, an allocation was made of this $750,000; and that under the said allocation the $750,000 was to be distributed as follows:

---

[3] Act 234 of 1947 obviously has no effect on the decision of these cases, and was not cited in the briefs or suggested in the oral argument. It is mentioned here merely to show a legislative recognition of the fact that Act 4 of 1941 established a bond year.

the first $200,000 to the bridge-bond retirement fund;

the next $140,000 to the road bond redemption account;

and all remaining amounts to go 45.12% to the municipal bond retirement fund, and 54.88% to the municipal turnback fund. The complaint also alleged that, under Act 192 of 1941 the municipal turnback fund should have received certain amounts; and the suit also involved the transfer of certain funds to the highway fund by virtue of Acts 418, 419, 420 and 427 of the 1941 General Assembly. In other words, the various phases of the refunding program under Act 4 of 1941 were consummated by these acts in the transfer of other funds to the highway fund. The complaint alleged that in the period from July 1, 1941, to June 30, 1943, the amounts credited to the municipal turnback fund were incorrectly calculated and determined, and that additional amounts should have been credited by the state treasurer to that fund and disbursed to the municipalities and counties.

A decree was entered in the suit on July 21, 1943, which recited in part:

"Wherefore, it is considered, ordered and decreed that the claim of the plaintiffs for any portion of the highway revenues coming into the State Highway Fund in any fiscal year not specifically allocated as provided in § 12 of Act 4 of 1941 is hereby dismissed for want of equity.

"It is further considered, ordered and decreed that the defendant, Earl Page, as Treasurer of the State of Arkansas, transfer the sum of $40,000 from the Bridge Bond Retirement Fund to the Municipal Turnback Fund for the two fiscal years ending June 30, 1943, and that he immediately disburse that amount, as prescribed by Act No. 385 of 1941, . . ."

No appeal was prosecuted by the state treasurer from this decree; and the cities and counties now claim that this 1943 decree definitely determined that the fiscal year—i. e., July 1 to June 30—governs in all matters of

the ingathering of the highway revenue. In other words, the cities and counties claim that the 1943 decree is *res judicata* on the question of "bond year v. fiscal year."

We do not agree. It will be observed that the 1943 decree (1) was concerned only with the matters *prior* to July, 1943; (2) came about because of the augmenting of the highway fund by the transfer of certain funds to it by 1941 acts Nos. 418, 419, 420 and 427 to supplement and complement Act 4 of 1941. In the present case we are concerned with highway revenue originating *since* July 1, 1943. The 1943 suit could not be *res judicata* on the distribution of revenue originating in subsequent years. In *Mo. P. Hosp. Assn.* v. *Pulaski Co., ante,* p. 9, 199 S. W. 2d 329, in discussing the plea of *res judicata* in matters of taxation, we said:

"The great weight of authority is to the effect that an adjudication upon liability for taxes of one year is no bar to an action for taxes for a subsequent year. In *Keokuk & W. R. Co.* v. *State of Missouri,* 152 U. S. 301, 14 S. Ct. 592, 597, 38 L. Ed. 450, the U. S. Supreme Court said: 'A suit for taxes for one year is no bar to a suit for taxes for another year. The two suits are for distinct and separate causes of action.'

"In *City of Newport* v. *Commonwealth,* 106 Ky. 434, 50 S. W. 845, 51 S. W. 433, 45 L. R. A. 518, the Kentucky Court of Appeals said: 'An adjudication upon a liability for taxes for one year is no bar to an action for taxes for a subsequent year.'

"In *Bank* v. *City of Memphis,* 101 Tenn. 154, 46 S. W. 557, the Tennessee Supreme Court said: 'The plea of *res judicata* is limited in its effect, in tax cases, to the taxes actually in litigation, and is not conclusive in respect of other taxes assessed for other and subsequent year.'

"In *Lake Shore & M. S. Ry. Co.* v. *People,* 46 Mich. 193, 9 N. W. 249, the Supreme Court of Michigan said: 'The result of a suit for the taxes of particular years is not *res judicata* in subsequent suits between the same

parties for taxes of other years, and the decisions upon legal questions arising in the first case are important only as precedents'."

The rationale of the above quotation, as applied to the present case is that the 1943 decree did not involve the matter of tax distribution for the years after July 1, 1943, so the plea of *res judicata* is without merit.

B.   The cities and counties contend that the Legislature, by § 10444, Pope's Digest, has fixed as "fiscal year," and that the Refunding Board is powerless to change the fiscal year. By Act 7 of 1921 (now § 10444, Pope's Digest) it was provided:

"Section 1. That there is hereby established and fixed a definite fiscal year for all offices, departments, institutions and other agencies of State government. Said fiscal year shall begin on July 1 and end on June 30. July 1, 1921, shall be considered the beginning of the first fiscal year under the provisions of this act."

The above was a legislative enactment of 1921, and any subsequent Legislature had the power to fix another term for a fiscal year, either for all state funds or for any particular part thereof. As regards revenue coming into the state highway fund, Act 4 of 1941 did change the year to the period beginning April 1, and ending March 31, following. That this was done has been demonstrated in discussing the provisions of said Act 4. So, the argument of the cities and counties based on § 10444, Pope's Digest, is without merit.

To conclude this topic of the opinion: we hold (1) that in fixing the period in which revenue arises under Act 4 of 1941, the Legislature fixed the year beginning April 1 and ending March 31 following; (2) that in such year the first $10,250,000 is governed by subdivision A of § 12 of Act 4; (3) that the next $2,500,000 is governed by subdivision B of said § 12; (4) that the next $750,-000—referred to herein as the gratuity money—is governed by subdivision C of § 12 of Act 4; (5) and that, as to the said gratuity money, the Legislature may act "as

the Legislature may from time to time prescribe'' (to quote the exact language of said section); and (6) this suit concerns only this gratuity money.

II. *Time of the Distribution of the Gratuity Money.* It will be observed from what we have said in I, *supra,* that, until after March 31 of each year there can be no definite and final determination as to how much gratuity money, if any, is to be distributed. We elucidate by illustration: On March 31, 1945, it was determined that there was $201,457.77 to go to the gratuity fund for the bond year ending that day; and, then, that amount became subject to distribution on any basis ''as the Legislature may from time to time prescribe'' (to quote the exact language found in § 12 of Act 4 of 1941). But none of that amount came into the gratuity fund until April 1, 1945. The Legislature, by Act 231 of 1943, used the term ''fiscal year ending June 30, 1945'' in making the appropriation from the gratuity fund. Construing the last-quoted language in the light of what has been said in Topic I, *supra,* we reach the conclusion that disbursement under the said appropriation act (1) could not be made before April 1, 1945, because until that date there was no fund; and (2) must be made before June 30, 1945, otherwise, the appropriation would expire. Article V, § 29 of the Constitution says:

''No money shall be drawn from the treasury except in pursuance of specific appropriation made by law, the purpose of which shall be distinctly stated in the bill, and the maximum amount which may be drawn shall be specified in dollars and cents; and no appropriations shall be for a longer period than two years.''

In *Moore* v. *Alexander,* 85 Ark. 171, 107 S. W. 395, we held that there could be no continuing appropriation, and that any appropriation beyond two years was void. See, also, *Lund* v. *Dickinson,* 126 Ark. 243, 190 S. W. 428.

We use this specific year, ending June 30, 1945, and the 1943 appropriation act to illustrate the meaning and effect of our holding in reconciling the ''bond year'' of Act 4 of 1941 with the ''fiscal year'' used in the various appropriation acts.

III. *Validity and Effect of Act 288 of 1943.* In order to appreciate the effect of this act on this litigation, it is well to review the situation before us:

(a)   Act 4 of 1941, by subdivision C of § 12, set aside $750,000 as gratuity money to be distributed "as the Legislature may from time to time prescribe."

(b)   Act 385 of 1941 was entitled "An act to provide for distribution of amounts received from the $750,000 allocation referred to in § 12 of Act 4 of the Acts of 1941 . . .: to prescribe the manner of payment of such funds so distributed . . ." The effect of this act was to make the said gratuity money payable as follows:

> by section 2, to the bridge bond retirement fund, the first $200,000;
>
> by section 3, to the road bond redemption account. the next $140,000;
>
> by section 4 (after the above $340,000 had been disbursed) the balance was to go 45.12% to the municipal bond retirement fund, and 54.88% to the municipal turnback fund.

The municipal improvement districts in this case claim to be the beneficiaries of the municipal bond retirement fund, and the cities and counties in this case claim to be the beneficiaries of the municipal turnback fund.

(c)   By Act 385 of 1941 the only municipal improvement districts which would receive any part of the municipal retirement fund were those districts which qualified under said act.

(d)   Section 4 of Act 385 of 1941 provides in part:

"The Treasurer of State shall also credit the Municipal Turnback Fund, at the end of each fiscal year, with the amount that the allocation to the Bridge Bond Retirement Fund exceeds the debt service requirements of such fund; with the amount that the allocation to the Road Bond Redemption Account exceeds the debt service requirements of such account; and with the amount that

the allocation to the Municipal Bond Retirement Fund exceeds the debt service requirements of such fund."

In this case the cities and counties claim that *all* of the municipal improvement districts entitled to receive aid under Act 385 of 1941 have been paid in full, so that *all* of the municipal bond retirement money accruing in 1943 and subsequent years should go to the municipal turnback fund under the section last quoted above.

(e) But the municipal improvement districts claim that Act 288 of 1943 increased the amount of gratuity to go to the municipal improvement districts so that they are entitled to continue to receive aid from the municipal bond retirement fund. In answer to that argument, the cities and counties say that Act 288 of 1943 is void.

The above poses the issue. We hold that Act 288 of 1943 is valid. The points urged by the cities and counties against the said act may be summaried and answered as follows:

1. The cities and counties say that Act 4 of 1941 is a contract between the state and the bondholders, and that Act 288 of 1943 attempts to change the act by increasing the basis of distribution of the gratuity money; and to that extent Act 288 is void. The answer is obvious: Act 4 of 1941, § 12, subdivision C reserves $750,000 for the state to distribute as gratuity money "as the Legislature may from time to time prescribe." The said Act 4 did not mention counties except in these words, "county roads adjacent to such cities and towns"; yet Act 385 of 1941 created the municipal turnback fund, and allowed counties to participate in the gratuity money; and in *Page* v. *State Improvement District No. 11 of Russellville*, 203 Ark. 657, 158 S. W. 2d 905, we upheld the validity of Act 385 of 1941. No beneficiary has a vested interest in the gratuity to be received from the state funds. *Cone* v. *Hope-Fulton-Emmet Road Improvement District*, 169 Ark. 1032, 277 S. W. 544. So, here, the cities and counties have no vested interest in the gratuity under either Act 4 or Act 385 of 1941, and the Legislature may grant or withhold the gratuity "as the Legislature may

from time to time prescribe." It 'is obvious that we consider this last-quoted clause as modifying all of the provisions of subdivision C, § 12 of Act 4 of 1941.

2. The cities and counties contend that Act 4 of 1941 was referred to the people and approved, and so, by force of paragraph 8 of Constitutional Amendment VII (the initiative and referendum amendment), the Legislature could not amend said Act 4 except by 2/3rds vote of each house, and that Act 288 of 1943 failed to receive such a vote. But the answer to that contention is likewise obvious: Act 385 of 1941 did not *amend* Act 4 of 1941, but only designated the beneficiary funds which the Legislature then desired to receive a part of the gratuity money under subdivision C of § 12 of said Act 4. Likewise, Act 288 of 1943 did not amend Act 4 of 1941, but only amended Act 385 of 1941; and this last-mentioned act was not a referred act, and could therefore be amended by an act receiving only a majority vote in each house; and Act 288 of 1943 did receive such majority vote.

We conclude, therefore, that Act 288 of 1943 is valid as against the attacks here made on it. The effect of this holding is to allow the municipal improvement districts an increased participation under the act; but it yet remains to be seen if the Legislature has made a valid appropriation for such increased participation. This point we now proceed to consider.

IV. *Sufficiency of the 1945 Appropriation Act.* Act 288 of 1943 declared the rights of the municipal improvement districts to additional aid, but that act was not an appropriation act. The appropriation act was Act 231 of 1943, captioned "An act to make appropriations of amounts received from the $750,000 allocation referred to in § 12 of Act 4 of the Acts of 1941 . . ." Section 5 of said Act 231 reads:

"There is hereby appropriated to be payable from the municipal bond retirement fund for the purpose of paying principal of and interest on municipal paving

bonds, *as now or as may hereafter be provided by law,* for the biennial period ending June 30, 1945, the following: . . ." (Italics our own).

The italicized words show that the appropriation was clearly sufficient to include the increased participation allowed by Act 288 of 1943. So, for the biennium ending June 30, 1945, there was a sufficient appropriation act.

But when we came to the biennium beginning July 1, 1945, and ending June 30, 1947, we find the appropriation act is not as broad as the previous act. Act 104 of 1945 is the appropriation act for the said biennium, and § 4 of that act reads: "There is hereby appropriated to be payable from the municipal bond retirement fund for the purpose of paying principal of and interest on municipal bonds, *under the provisions of Act 385 of 1941,* the following . . ." (Italics our own).

It will be observed instantly that this act appropriates money from the municipal bond retirement fund only to pay items allowable under Act 385 of 1941, and does not include—directly or by implication—Act 288 of 1943 or any other act except Act 385 of 1941. It follows, therefore, that for the biennium beginning July 1, 1945, and ending June 30, 1947, said Act 104 of 1945 makes no appropriation to carry into effect Act 288 of 1943. See *Moore* v. *Alexander, supra,* and *Jobe* v. *Caldwell,* 93 Ark. 503, 125 S. W. 423, 99 Ark. 20, 136 S. W. 966. Article XVI, § 12 and Article V, § 29 of the Constitution of the State of Arkansas concern the necessity for sufficient and definite appropriations. Commenting on these provisions in *Ark. G. & F. Commission* v. *Page,* 192 Ark. 732, 94 S. W. 2d 107, we said:

"Peculiarly applicable to the instant case is the announcement in *Dickinson, State Auditor* v. *Clibourn,* 125 Ark. 101, 187 S. W. 909.

" 'All moneys must be specifically appropriated and specifically applied.' *Lund* v. *Dickinson, State Auditor,* 126 Ark. 243, 190 S. W. 428. These provisions of the Constitution are mandatory and must be enforced."

For all that is shown in the record in the cases before us, the additional aid to the municipal improvement districts under Act 288 of 1943 cannot be paid during the biennium beginning July 1, 1945, and ending June 30, 1947, for want of a valid appropriation act.

## CONCLUSION

To summarize and conclude:

In Case No. 7956 the decree of the chancery court is reversed and the cause remanded, with directions to dismiss the complaints and interventions of the cities and counties, and to enter a decree in keeping with this opinion.

In Case No. 8059 the judgment of the circuit court is cancelled, and the cause dismissed as moot, because of the order here directed in Case No. 8205.

In Case No. 8205, the decree of the chancery court is affirmed, insofar as it upholds the validity of Act 288 of 1943, but the cause is remanded to the chancery court so that a decree may be entered in keeping with the other provisions of this opinion.

As regards costs: each party will bear all costs already paid by such party, but any unpaid costs will be paid equally, one-half by the cities and counties and one-half by the municipal improvement districts.

The Chief Justice and Mr. Justice MILLWEE voluntarily disqualified in these cases, and did not participate in the consideration or determination of the appeals; nor did they attend the conferences at which the cases were discussed.

Mr. Justice ROBINS dissents as to that portion of the opinion which sustains the validity of Act No. 288 of 1943.