YOUNG *v.* CLAYTON, STATE TREASURER.

5-228                                            264 S. W. 2d 41

Opinion delivered January 25, 1954.

[Rehearing denied February 22, 1954.]

*Edward E. Stocker* and *Cooper Jacoway,* for appellant.

*Tom Gentry,* Attorney General, and *Roy Finch, Jr.,* for appellee.

GEORGE ROSE SMITH, J. This is a representative suit brought by the appellant against the State Treasurer and the State Auditor. The plaintiff is the owner of refunding bonds issued under Act 4 of 1941 (Ark. Stats., 1947, Appendix to Title 13, p. 773) and sues on behalf of all the bondholders. The theory of the complaint is that Act 4 pledged certain highway revenues as security for the payment of the refunding bonds, that this pledge constituted a contract between the State and its bondholders, and that the contract has been impaired by the Revenue Stabilization Law of 1945 and subsequent legislation. Ark. Stats., Title 13, Ch. 5. The chancellor found that there had been no impairment of the contract, and the complaint was dismissed for want of equity.

The principal issue may be stated quickly. Section 12 of Act 4 of 1941 provided that revenues coming into the State Highway Fund in each fiscal year should be allocated as follows: A. The first $10,250,000 was set aside for highway maintenance and debt service. B. The next $2,500,000 was set aside for new construction and maintenance. C. The next $750,000 was set aside for five enumerated purposes that we need not detail. D. "The highway revenues coming into the State Highway Fund in any fiscal year not specifically allocated to the foregoing purposes may be used for the construction of new roads, for maintenance, or for calling in and redeeming bonds under § 5 of this act, as the legislature may

direct.'' (The lettering of the subsections is that used in *Clayton* v. *Little Rock*, 211 Ark. 893, 204 S. W. 2d 145.)

It is provided in substance by the Revenue Stabilization Law of 1945, and by later statutes on the subject, that every State agency and activity shall contribute to the support of the legislative, executive, and judicial branches of the State government. To this end, the Treasurer is directed to deduct three per cent from all general and special revenues and to transfer the amount so deducted to the General Revenue Fund. Ark. Stats., § 13-511; see also Act 118 of 1953, § 12. The appellant's contention is that, although it is proper to charge the actual expenses of collection against the highway revenues pledged for the security of the refunding bonds, the three per cent deduction exceeds the actual costs of collection and therefore amounts to a diversion of the funds to purposes not specified by Act 4 of 1941.

This basic contention, that the pledged revenue cannot be charged with substantially more than the actual cost of its collection and administration, is sustained by the decision in *County Board of Education* v. *Austin,* 169 Ark. 436, 276 S. W. 2. There a statute authorized the county collector and treasurer to charge certain fees for the collection of taxes, including school taxes. It was further provided that these fees, after the salaries of the collector and treasurer had been paid therefrom, should be covered into the county general fund. Since the constitution forbade the diversion of school funds, the statute was held invalid to the extent that it permitted the school fund to be charged with more than its share of administrative expenses. ''Certainly the school fund should not be made to bear more than its just proportion of the salaries of the collector and treasurer. This fund, however, should be required to bear its just proportion of these salaries. To so require would not be a diversion of such fund because the school fund must be collected and paid into the treasury and must be handled and disbursed after it is covered into the treasury. So the act of the officers in collecting and handling the school fund

is germane to the purpose for which it is raised." In like manner the highway revenues pledged by the refunding law must be collected, handled, protected, and disbursed, and the Highway Fund may be required to bear its just share of these administrative costs. By the same reasoning, however, money cannot be diverted from highway purposes under the guise of a service charge that materially exceeds the amount fairly attributable to the cost of collecting and administering the funds.

The appellees do not question the controlling force of the *Austin* case; instead their argument is that only allocations A and B, comprising the first $12,750,000 of highway revenues, have been pledged as security for the bonds, leaving the State free to spend the rest as it pleases. The language of the statutes does not support this conclusion. It has been recognized all along that the refunding laws constitute contracts binding upon the State. *Scougale* v. *Page*, 194 Ark. 280, 106 S. W. 2d 1023; *Fulkerson* v. *Refunding Board*, 201 Ark. 957, 147 S. W. 2d 980. Allocations A and B of the 1941 contract are mandatorily devoted, in specified amounts, to debt service, new construction, and maintenance. Allocations C and D allow, it is true, some leeway to the legislature, in that one or more of several designated highway purposes may be furthered with these funds. But the point is that this orbit of legislative choice is nevertheless confined to the various highway aims enumerated in subsections C and D; there is nothing to indicate that the General Assembly may in its discretion apply the pledged highway revenues to governmental functions outside the scope of § 12 of Act 4. That this restriction adds to the security of the bonds cannot be questioned, since the highway system must be maintained in a travelable condition if income is to be produced from motor vehicle fuel taxes and license fees, which are the main components of the highway revenues.

The appellees point out that we have characterized allocations C and D as "gratuities," but the reference

must be read in its context. In the earlier *Clayton* case, cited above, several cities and counties contended that they were entitled to a certain share of allocation C as a matter of right; but we held, quoting the statute, that the $750,000 allocated in subsection C is subject to distribution "as the Legislature may from time to time prescribe." Since the statute leaves the General Assembly free to choose among five enumerated purposes, no particular beneficiary "has a vested interest in the gratuity to be received from the state funds." Later on, in *Pickens* v. *McMath,* 215 Ark. 332, 220 S. W. 2d 602, we again said, in discussing the *Clayton* case, that allotments C and D are in the nature of gratuities. But on its facts the *Pickens* case simply held that bonds issued for highway construction and maintenance could be secured by a pledge of subsection D funds. That subsection expressly authorized expenditures for new construction and maintenance, and the 1949 bond issue came fully within the purview of the statute. None of our prior cases involved, as this one does, the suggestion that highway revenues may be diverted from highway purposes; so they afford no support for the argument now made by the appellees.

It is our conclusion that the State's contract with its bondholders precludes it from turning the pledged revenues into channels other than those contemplated by the refunding laws. The complaint charges that such a diversion has already occurred and asks that the misappropriated money be restored to the Highway Fund and that future diversions be enjoined. The remaining question, and a more difficult one, is whether the bondholders have made a case entitling them to this relief.

It will be remembered that in the *Austin* case the statute permitted the salaries of the county collector and treasurer to be deducted from their fees for the collection of taxes. In the case at bar the plaintiff, apparently acting upon the analogy of that case, takes the position that highway revenues can be charged only with their proportionate part of the cost of operating the State

Revenue Department and the State Treasurer's office. Upon this premise the plaintiff introduced in the trial court a stipulation showing (a) the amount of highway revenues for each of the five fiscal years between June 30, 1947, and June 30, 1952; (b) the amount of the State's total revenues for those years; and (c) the actual cost of operating the Revenue Department and the Treasurer's office for those years. On the basis of these figures, taken alone, the Highway Fund has contributed $1,871,-020.26 more than its proportionate part of the operating expenses of the two agencies mentioned. Thus the plaintiff's prayer for relief involves a request that that sum of money be transferred to the State Highway Fund from the General Revenue Fund (or from its successor, if identifiable. See Act 118 of 1953).

In considering this request we think it necessary to put more emphasis than usual upon the issues that we are *not* deciding. We do not intend, for example, to approve for all time the plaintiff's theory that only the expenses of the Revenue Department and the Treasurer's office are proper charges against revenues devoted to specified purposes. That issue may well involve a question of fact, and we would not lightly disregard the General Assembly's considered opinion that other factors should enter into the calculation. Act 490 of 1949, § 1; Act 118 of 1953, § 12. Neither do we mean to approve by implication the appellant's delay of eight years in bringing the 1945 Stabilization Law to our attention or his attempt to disturb the allocation of State funds long after the close of the fiscal year.

The single ground upon which we rest today's decision is that the plaintiff has failed to prove that the funds allegedly diverted are still available for a retransfer to the Highway Fund. Of course, the plaintiff had the burden of proof, but he shows only the balance in the General Revenue Fund on the last day of each of the five fiscal years in question. It is stipulated, for instance,

that the balance on June 30, 1952, was $3,102,617.99. But there is nothing in this record to show that the balance did not at some time during the preceding fiscal year fall far below the amount now in controversy—even down to nothing. We think that it was of primary importance for the plaintiff to show that the balance in the General Revenue Fund has continuously been sufficient to warrant our granting him at least some relief.

This distinction is plainly one of substance rather than of form. If the State Treasurer, acting under a misconception of the law, erroneously credits tax funds to the wrong account, mandamus will lie to compel him to correct his mistake. As long as the funds are still in his hands the writ merely requires him to correct a bookkeeping error. But if, as we must assume to be true in this case, the funds have passed beyond the Treasurer's control, the correction involves more than a bookkeeping entry. Such a correction would require the sovereign to replace funds already expended; in substance it would amount to a suit against the State. Consequently legislative authority is needed for such a replacement.

The authorities on this issue are in agreement. Exactly in point is the case of *Davis* v. *Pensioners Protective Ass'n,* 110 Colo. 380, 135 P. 2d 142. There the Colorado constitution dedicated certain tax money to the payment of old age pensions. The legislature passed an act providing that five per cent of the tax money should be used for specified administrative expenses. It was shown by the plaintiff, just as it is here, that the charge was excessive and that the excess had been applied to other purposes. The court held the statute unconstitutional, but it refused to order the state treasurer to restore the credit to the old age pension fund. "Without a showing, and there is none in the record, that the defendants or some of them acting in their official capacities, are empowered to re-transfer such funds, we know of no way, and none is suggested, in which the defendants could comply with a court's order that such diverted funds be now applied to the payment of old age pensions. The General Assembly alone represents the legislative.

one of the three coordinate branches of the state government. It is not subject to control in a purely legislative function, such as the appropriation or allocation of money, by the judicial branch of the government. In the case at bar the courts can do no more than declare to be unconstitutional the act of the General Assembly providing for diverting funds from their constitutionally prescribed use.''

The fact that in a situation of this kind the burden of proof is on the plaintiff was stressed in *State ex rel. Hillsborough County* v. *Amos,* 100 Fla. 1335, 131 S. 122. The relators sought by mandamus to compel the state comptroller to remit certain funds to Hillsborough County. But there, as here, the proof was defective; it failed to show that the comptroller had not already paid the money into the state treasury, putting it beyond his control. In denying relief the court said: ''When a writ of mandamus is sought to compel the comptroller to disburse moneys, his ability as well as his duty to comply with the command of a peremptory writ, and also relator's right to have the duty performed, must clearly appear. . . . The requirement is not met in the absence of a clear showing that the funds sought are in the hands or under the control of the comptroller in such manner that he has the authority and ability to disburse them. That vital element of relators' right to the writ cannot be left to inference or conjecture. . . . Whether or not the comptroller has remitted these funds to the treasurer pursuant to the comptroller's existing practice in these matters does not appear. That the comptroller has done so is not negatived by the petition. If these funds are in the state treasury, mandamus will not lie against the comptroller to command the disbursement of funds over which he has no control, even though the comptroller has mistakenly paid the funds to the treasurer under a misconception of his duty under the statute. Nor could such fund be withdrawn from the treasury except pursuant to an appropriation made by law.'' Much to the same effect is *Board of Revenue of Jefferson County* v. *Birmingham,* 205 Ala. 338, 88 So. 16, where it

was held: "However, mandamus cannot be awarded in this instance, for the reason that the entire road fund in question has been expended, and there is no other fund from which it can be lawfully replaced. Mandamus is not the proper remedy in cases of misappropriation."

Since the appellant has not shown that the funds now in controversy are still in the General Revenue Fund we cannot grant his request that a mandatory injunction be issued to require the State Treasurer to restore this money to the credit of the Highway Fund. Neither do we think that in these circumstances the Treasurer should be enjoined from permitting a diversion of highway money in the future. As we have already said, whether the charge against highway revenues exceeds reasonable administrative costs may present a question of fact. A continuing injunction would require the Treasurer to determine that issue of fact correctly throughout the indefinite future, else he might be held in contempt of court. We do not think it seemly for the judiciary to impose such a burden upon the executive branch of the government. Rather, the Treasurer should be left free to obey the law as laid down by the General Assembly, and, with respect to any fiscal year subsequent to June 30, 1952, the burden will be on the bondholders to assert their rights if they have reason to think that an unlawful diversion of funds has occurred.

The conclusion we have reached makes it unnecessary for us to determine whether Act 260 of 1935 might be relied upon as a justification for the three per cent deduction attacked by the appellant.

The chancellor was in error in his conclusion that an excessive service charge against the Highway Fund would not involve a breach of the State's contract with its creditors. But the chancellor's action in dismissing the complaint was correct, for the reason that the proof does not entitle the plaintiff to relief against the State Treasurer or the State Auditor. The decree must therefore be affirmed.

MILLWEE, J., not participating.

GRIFFIN SMITH, Chief Justice, concurring. I would affirm the case under Act 260 of 1935. Before the highway bonds now outstanding were issued through a refunding process the General Assembly found, ''as a matter of fact'', that a maximum charge for collecting and for the services rendered the collecting agencies was ''equal to three per cent of the amount collected by the several statutory agencies, and that such an amount should be, and the same is hereby fixed, as the correct sum to be collected from all funds coming into the hands of or passing through the regularly designated collection agencies, officers, or departments, and going into the state treasury''.

It is common knowledge that General Revenue, from which constitutional officers and their maintenance were paid, was depleted in 1935, and that in 1932 and during the first month of 1933 state warrants were being sold at a shameful discount. Act 260 was the law-making body's effort to correct this evil. Whether the Act at *that* time, if challenged, would have been held a violation of the obligation of contract through impairment of the bonds then outstanding is beside the point. Validity of the enactment was not challenged and new bonds were issued with notice to purchasers that the highway fund was subject to assessment.

I would therefore hold that under the showing in the case at bar the appellant is barred by the legislative finding which became a part of the condition when the state sold its bonds.